PATER, APPELLEE, *v.* PATER, APPELLANT.

[Cite as *Pater v. Pater* (1992), 63 Ohio St.3d 393.]

(No. 90–2447—Submitted December 10, 1991—Decided April 15, 1992.)

394

*Bolsinger & Brinkman, Don C. Bolsinger* and *Karen R. Brinkman,* for appellee.

*Wilma B. Mesaros, Thomas J. Mirras* and *Carolyn R. Wah,* for appellant.

WRIGHT, J. Today we reaffirm that a domestic relations court may consider the religious practices of the parents in order to protect the best interests of a child. *Birch v. Birch* (1984), 11 Ohio St.3d 85, 11 OBR 327, 463 N.E.2d 1254. However, the United States Constitution flatly prohibits a trial court from ever evaluating the merits of religious doctrine or defining the contents of that doctrine. *Thomas v. Review Bd. of Ind. Emp. Sec. Div.* (1981), 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624. Furthermore, custody may not be denied to a parent solely because she will not encourage her child to salute the flag, celebrate holidays, or participate in extracurricular activities. We reverse the

trial court's custody and visitation orders because these decisions were improperly based on Jennifer Pater's religious beliefs.

Our analysis of this case begins with the child custody statute and our standard of review in custody disputes. Former R.C. 3109.04(C) (now 3109.-04[F][1][c], [d] and [e] ) provided that to determine the best interests of a child, a domestic court judge *must* consider all relevant factors, including:

"* * * *

"(3) The child's interaction and interrelationship with his parents, siblings, and any other person who may significantly affect the child's best interest;

"(4) The child's adjustment to his home, school, and community;

"(5) The mental and physical health of all persons involved in the situation."

The statutory standard is written broadly and requires the domestic relations judge to consider all factors that are relevant to the best interests of the child. The purpose of a far-reaching inquiry is to allow the judge to make a fully informed decision on an issue as important as which parent will raise the child. "The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record." (Citations omitted.) *Miller v. Miller* (1988), 37 Ohio St.3d 71, 74, 523 N.E.2d 846, 849. A reviewing court will not overturn a custody determination unless the trial court has acted in a manner that is arbitrary, unreasonable, or capricious. *Id.*

It is against this standard of broad discretion that we must review the scope of a trial court's inquiry into the parents' religious practices. The other starting point for our analysis is that a court may well violate the parent's constitutional rights if its decision is improperly based on religious bias. See *Palmore v. Sidoti* (1984), 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421 (courts cannot implement private prejudices, even if they are widely held by the population). The United States Constitution and the Ohio Constitution forbid state action which interferes with the religious freedom of its citizens or prefers one religion over another.[2] To the extent that a court refuses to

---

2. The First Amendment to the United States Constitution provides that:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof * * *."

Section 7, Article I of the Ohio Constitution provides as follows:

"All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience. No person shall be compelled to attend, erect, or support any

award custody to a parent because of her religious beliefs, the court burdens her choice of a religion in violation of the Free Exercise Clause of the United States Constitution. See *Cantwell v. Connecticut* (1940), 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213, 1218 (religious beliefs are absolutely protected); *Employment Division v. Smith* (1990), 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (state discrimination based on religious beliefs is prohibited, although a state may regulate the physical acts that result from those beliefs).[3]

In addition to their free exercise rights, parents have a fundamental right to educate their children, including the right to communicate their moral and religious values. *Wisconsin v. Yoder* (1972), 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15; *Pierce v. Society of Sisters* (1925), 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070. " * * * '[T]he Court's holding in *Pierce* stands as a charter of the rights of parents to direct the religious upbringing of their children.' " *Employment Division v. Smith, supra,* 494 U.S. at 881, 110 S.Ct. at 1601, 108 L.Ed.2d at 887, fn. 1 (quoting *Wisconsin v. Yoder, supra*). In a custody dispute, the parents' rights must be balanced against the state's need to determine the best interests of the child. See *Wisconsin v. Yoder, supra,* 406 U.S. at 221, 92 S.Ct. at 1536, 32 L.Ed.2d at 28; *Employment Division v. Smith, supra.* This balancing requires more than a rote recitation that a domestic relations judge may consider any factor relevant to the best interests of a child, especially if the best-interests test is read broadly to encompass all aspects of childrearing. See Mangrum, Exclusive Reliance on Best Interest May Be Unconstitutional: Religion as a Factor in Child Custody Cases (1981), 15 Creighton L.Rev. 25.

Courts have repeatedly held that custody cannot be awarded solely on the basis of the parents' religious affiliations and that to do so violates the First Amendment to the United States Constitution. *Clift v. Clift* (Ala.App. 1977), 346 So.2d 429, 434; *Quiner v. Quiner* (Cal.App. 1967), 59 Cal.Rptr. 503; *In re*

---

place of worship, or maintain any form of worship, against his consent; and no preference shall be given, by law, to any religious society; nor shall any interference with the rights of conscience be permitted. * * * "

3. Several commentators have noted the constitutional problems raised when a state inquires into the religious beliefs of the parents. Their general consensus is that courts may not prefer one parent over the other for religious reasons and that blind adherence to the best-interests test, if the religious practices in question do not pose a threat to the child's health, may be unconstitutional. See Note, The Establishment Clause and Religion in Child Custody Disputes: Factoring Religion into the Best Interest Equation (1984), 82 Mich.L.Rev. 1702, 1702–1705; Mangrum, Exclusive Reliance on Best Interest May Be Unconstitutional: Religion as a Factor in Child Custody Cases (1981), 15 Creighton L.Rev. 25, 26–30, 51–74; Note, The Religious Upbringing of Children After Divorce (1980), 56 Notre Dame Lawyer 160, 164–166.

*Marriage of Short* (Colo. 1985), 698 P.2d 1310, 1313; *Compton v. Gilmore* (1977), 98 Idaho 190, 560 P.2d 861; *Burnham v. Burnham* (1981), 208 Neb. 498, 502, 304 N.W.2d 58, 61.

On the other hand, a parent's actions are not insulated from the domestic relations court's inquiry just because they are based on religious beliefs, especially actions that will harm the child's mental or physical health. See *Prince v. Massachusetts* (1944), 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645; *Birch v. Birch, supra.* In *Birch,* we held that courts can examine the parent's religious practices to determine the best interests of the child because " * * * the law does not require that a child be actually harmed or that a parent's unsuitability to have custody of her children be disregarded because the parent claims that the bases of her unsuitability are religious practices." *Birch v. Birch, supra,* 11 Ohio St.3d at 88, 11 OBR at 330, 463 N.E.2d at 1257. The state's compelling interest in protecting children from physical or mental harm clearly allows a court to deny custody to a parent who will not provide for the physical and mental needs of the child.

The facts of this case, however, bear little or no resemblance to those in *Birch.* That case involved a woman who had formerly been hospitalized for schizophrenia and who had neglected her children's physical needs as a result of her religious fanaticism. In contrast, Robert and Jennifer Pater are both loving parents, and no testimony seriously disputed either parent's ability to nurture Bobby. This case requires us to decide whether courts may deny a parent custody based on beliefs that do not pose a direct threat to the child's mental or physical welfare. Given the undisputed fact that both parents would meet Bobby's basic needs, the question is whether the intrusion into Jennifer's rights was justified by appellee's claims that if awarded custody, Jennifer would not allow Bobby to participate in certain extracurricular activities, celebrate holidays, or salute the flag.

Appellee claims that Jennifer will not allow their son to celebrate birthdays and holidays, sing the national anthem, salute the flag, participate in extracurricular activities, socialize with non-Witnesses, or attend college. Appellee is concerned that the child will be socially ostracized and not adequately exposed to ideas other than those endorsed by the Jehovah's Witnesses. We can sympathize with his parental concern for his child, but are concerned that the state not exceed its proper role in resolving what is essentially a dispute between the parents' religious beliefs. Although the listed activities are those that most people may consider important to the socialization of children, we need to separate the value judgments implicit in the so-called norm from any actual harm caused by these practices. See *Whaley v. Whaley* (1978), 61 Ohio App.2d 111, 118, 15 O.O.3d 136, 140, 399 N.E.2d 1270, 1275 (a parent's sexual

activity is not a basis to change custody unless it has an adverse impact on the child; otherwise, the court is punishing the parent's moral conduct even though a change in custody is very stressful for a child).

Even if we accept the premise that Jennifer will actively forbid Bobby to celebrate holidays, be involved in extracurricular activities, or salute the flag,[4] these practices do not appear to directly endanger the child's physical or mental health. A showing that a child's mental health will be adversely affected requires more than proof that a child will not share all of the beliefs or social activities of the majority of his or her peers. A child's social adjustment is very difficult to measure, and the relative importance of various social activities is an extremely subjective matter.[5] For these reasons, a court must base its decision that a particular religious practice will harm the mental

---

4. This very well may be an assumption that we are not entitled to make. Jennifer testified that she was willing to allow Bobby to choose his own religion when he reached a suitable age. She also testified that she would not encourage him to celebrate holidays or salute the flag, and wished to explain to him why she did not do these things. She further testified that Bobby would be allowed to form friendships with other children so long as they were not a bad influence on him and that he could participate in suitable extracurricular activities. The evidence that she would do otherwise is based on the testimony of other Jehovah's Witnesses and religious publications. "Intrafaith differences * * * are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences in relation to the Religion Clauses. * * * Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith." *Thomas v. Review Bd. of Ind. Emp. Sec. Div.* (1981), 450 U.S. 707, 715–716, 101 S.Ct. 1425, 1430–1431, 67 L.Ed.2d 624, 632 (reversing a state court that denied unemployment benefits to a Jehovah's Witness who would not manufacture weapons on the basis of evidence that other Witnesses would accept this type of employment).

5. Not only is an evaluation of the merits of different social activities subjective, but it is also of limited relevance to the best interests of a child. This can be easily demonstrated by considering plaintiff's claims that the child will be harmed if he does not participate in particular activities. For example, we first consider plaintiff's allegation that the child will suffer socially if he is not permitted to display patriotism, by saluting the flag or singing the national anthem. As important as these activities are personally to those of us who honor our country in these ways, these activities are just that, personal expressions, which a court should not force upon parents or their children. It seems obvious that this sort of personal decision that affects only the expression of political or religious beliefs should not be the basis for a custody decision.

The plaintiff is particularly concerned that Jennifer will not permit the child to join various social organizations and invokes the image of a child without friends or social contacts. Despite this painful image, the parties actually are disagreeing not about whether a child should have social interactions, but about what type of social activities are appropriate for the child. Whatever their position may be regarding contact with people who are not members of the religion, Jehovah's Witnesses have an active social life among themselves. Even if a Witness did not allow her child to participate in extracurricular activities or maintain close friendships with persons outside the religion, the child would still participate in social activities and have friends.

health of a child on more than the fact that the child will not participate in certain social activities.[6] A parent may not be denied custody on the basis of his or her religious practices unless there is probative evidence that those practices will adversely affect the mental or physical health of the child. Evidence that the child will not be permitted to participate in certain social or patriotic activities is not sufficient to prove possible harm.

The evidence offered by appellee to prove that these practices would harm Bobby consisted of two expert witnesses. Dr. Bergman testified, on the basis of a dissertation he had written, that mental illness was more common among Jehovah's Witnesses than among the general population. This testimony was a blatant attempt to stereotype an entire religion. Regardless of the rate of mental illness among an entire group, that evidence does not prove that the religion in question will negatively affect a particular individual. Furthermore, this one piece of statistical evidence is meaningless. To follow this evidence to its "logical" conclusion, a court would need to compare this rate to the same rate for all faiths and for people who are not associated with any particular religion. If the latter group has the lowest incidence of mental illness, then under this reasoning we would have to forbid all parents from exposing their children to their religious beliefs.

Dr. Denber testified that generally extracurricular activities are beneficial to a child's socialization. Neither Dr. Denber nor Dr. Bergman had interviewed Bobby. No proof was offered that this particular child was suffering or would suffer any ill effects from being exposed to his mother's religious practices. In the absence of any probative evidence that a child will be harmed by a parent's religious practices regarding social activities, the court may not use those beliefs to disqualify the parent as the custodial parent.

We feel it is appropriate to question a parent about her general philosophy of childrearing. However, the scope of this inquiry into the religious beliefs and practices, not just of the mother, but of an entire religion was improper and an abuse of discretion. The isolated statements of the trial judge that he

---

6. The majority of courts that has dealt with a custody dispute between a Jehovah's Witness and a parent of another faith has held that the court may not base its decision on whether a parent believes in allowing the child to exhibit national pride, participate in extracurricular activities, or celebrate holidays. *Clift, supra,* 346 So.2d at 435; *Johnson v. Johnson* (Alaska 1977), 564 P.2d 71, certiorari denied (1978), 434 U.S. 1048, 98 S.Ct. 896, 54 L.Ed.2d 800; *In re Marriage of Urband* (1977), 68 Cal.App.3d 796, 137 Cal.Rptr. 433; *Meredith v. Meredith* (1967), 91 Idaho 898, 434 P.2d 116; *Upon Petition of Deierling* (Iowa App.1988), 421 N.W.2d 168, 170; *Waites v. Waites* (Mo.1978), 567 S.W.2d 326. These courts have reasoned that these beliefs are not relevant to a parent's ability to care for her child, and that the United States Constitution requires that a court not examine the parent's religious beliefs unless they result in a practice that negatively affects the best interests of the child.

would not decide custody on the basis of the mother's religious beliefs will not insulate the court's decision from review.

The trial court appears to have awarded custody to Robert because of Jennifer's religious affiliation. There is no dispute that both parents are excellent parents and we must begin from the assumption that both are equally competent to care for this child. However, at the time of the hearing, Jennifer had been Bobby's primary caretaker for the first three years of his life. She also testified that she would have more time during the week to devote to the child because she worked on only one or two weekdays. Jennifer deserves a custody hearing free from religious bias.[7]

The visitation order in this case also indicates that the court's decision was based on Jennifer's religion. The order demands that Jennifer "shall not teach or expose the child to the Jehovah[']s Witnesses' beliefs in any form." This order is so broad that it could be construed as forbidding any discussion of the Bible. It is equally unclear whether Jennifer is permitted to discuss moral values because these values are influenced by religious beliefs.

" * * * [T]he rule appears to be well established that the courts should maintain an attitude of strict impartiality between religions and should not disqualify any applicant for custody or restrain any person having custody or visitation rights from taking the children to a particular church, except where there is a clear and affirmative showing that the conflicting religious beliefs affect the general welfare of the child." *Munoz v. Munoz* (1971), 79 Wash.2d 810, 813, 489 P.2d 1133, 1135. See *Hanson v. Hanson* (N.D.1987), 404 N.W.2d 460, 463; *Compton v. Gilmore, supra; Felton v. Felton* (1981), 383 Mass. 232, 418 N.E.2d 606; *In re Marriage of Murga* (1980), 103 Cal.App.3d 498, 163 Cal.Rptr. 79; *Angel v. Angel* (C.P.1956), 74 Ohio Law Abs. 531, 2 O.O.2d 136, 140 N.E.2d 86. This rule has been adopted to protect both parents' right to expose their children to their religious beliefs, a right that does not automatically end when they are divorced. The courts should not interfere with this relationship between parent and child unless a child is exhibiting genuine symptoms of distress that are caused by the differences in the parents' religious beliefs. Today, we adopt the majority rule that a court may not restrict a non-custodial parent's right to expose his or her child to religious beliefs, unless the conflict between the parents' religious beliefs is affecting the child's general welfare. Because a divorce is a stressful event for a child, a court must carefully separate the distress caused by that event from any distress allegedly caused by religious conflict.

---

7. Another custody hearing will allow the court to evaluate any changes that have occurred since August 1988.

Accordingly, the judgment of the court of appeals is reversed, and the cause is remanded to the trial court for further proceedings in accordance with this opinion.

*Judgment reversed*
*and cause remanded.*

MOYER, C.J., SWEENEY, DOUGLAS and H. BROWN, JJ., concur.

HOLMES and RESNICK, JJ., concur in part and dissent in part.

ALICE ROBIE RESNICK, J., concurring in part and dissenting in part. Because I agree that the trial court's order forbidding Jennifer from exposing Bobby to her religious beliefs was unduly broad, I concur in paragraph two of the syllabus. However, I do not agree that the trial judge abused his discretion in awarding custody to Robert. For that reason, I dissent from that part of the majority opinion which overturns the determination to award custody to Robert, and also from paragraph one of the syllabus.

The court of appeals, in its opinion affirming the judgment of the trial court, stated:

"The trial court considered the factors in [former] R.C. 3109.04(C) and other relevant factors and then awarded custody of Bobby to Robert. On the state of the record before us, we cannot say that this decision constituted an abuse of the trial court's discretion in determining matters of custody."

In reaching this conclusion, the court of appeals determined that the record did not support Jennifer's claim that the trial court's decision was based solely on the religious beliefs of the parents. Rather, the record established that the trial court was attempting to determine the best interests of the child. While I would concede that the court of appeals included some speculation in its opinion that may have improperly emphasized problems which could occur if Jennifer were to be granted custody, those observations are irrelevant to the issues before us. They should not prevent us from holding that the trial court acted within the bounds of its discretion.

I question the workability of the standard the majority formulates in paragraph one of the syllabus. In the first place, the majority begins by assuming that the trial judge based his custody decision solely on the religious issues before him. As previously stated, I disagree with that interpretation of the record. In addition, I am not sure how a trial judge should apply the standard. It would seem to be difficult for anyone to ever prove that specific religious practices will or will not adversely affect the health of a child in the future.

It is the role of a trial judge at a custody hearing to consider all relevant factors, and then reach a decision. That decision is based primarily on the best interests of the child, with *all* other concerns of secondary importance. Because the trial judge is in the best position to evaluate the child's best interests, a reviewing court should accord great deference to the decision of the trial judge. In this case, the trial judge considered all the relevant factors, and made a decision in a difficult situation involving two "conscientious and loving" parents.

Because I do not think the decision of the trial judge was "unreasonable, arbitrary, or unconscionable," *Miller v. Miller* (1988), 37 Ohio St.3d 71, 74, 523 N.E.2d 846, 849, I would affirm the judgment of the court of appeals.

HOLMES, J., concurs in the foregoing opinion.