WILLIS, n.k.a. Stegner, Appellee,

v.

WILLIS, Appellant.

[Cite as *Willis v. Willis,* 149 Ohio App.3d 50, 2002-Ohio-3716.]

Court of Appeals of Ohio,
Twelfth District, Butler County.

No. CA2001–09–204.

Decided July 22, 2002.

Timothy N. Tepe, for appellee.

Pratt, Singer & Thomas Co., L.P.A., and Gregory K. Pratt, for appellant.

Karan M. Horan, guardian ad litem.

———————

VALEN, Judge.

{¶ 1} Defendant-appellant, Chris Willis, appeals a decision of the Butler County Court of Common Pleas, Domestic Relations Division, restricting his visitation with the parties' minor children and finding him in contempt for failing to pay the children's medical expenses not covered by health insurance.

{¶ 2} Chris and plaintiff-appellee, Rhonda Willis, n.k.a. Rhonda Stegner, were divorced for the second time on March 5, 1998. They have three minor children, Ciara (born September 28, 1990), Cody (born January 12, 1993), and Chloe (born July 19, 1995). Under the parties' shared parenting agreement, Rhonda was named residential parent for school purposes and Chris was granted "Schedule B" visitation with an additional Sunday per month from 4:00 to 8:00 p.m. Except on a few occasions, Chris has not exercised his extra Sunday visitation.

{¶ 3} Between August 2000 and January 2001, both parties filed several motions. In particular, Rhonda filed motions to find Chris in contempt for failing to pay his portion of the children's uncovered medical bills and for failing to comply with his "Schedule B" visitation. Rhonda also filed a motion to modify and/or restrict Chris's visitation and a request that he undergo psychological counseling. In turn, Chris filed motions to find Rhonda in contempt for failing to comply with his "Schedule B" visitation and for failing to keep him informed of the children's medical needs and extracurricular activities. Chris also filed a motion to increase his visitation. The parties and all three children were subsequently evaluated at the Children's Diagnostic Center, Inc. ("CDC"). A hearing on the parties' motions and a report from the CDC revealed the following facts:

{¶ 4} Rhonda lives in Richmond, Indiana, and has been engaged to Michael Simmons since January 2001. Chris lives in Middletown, Ohio, and is not involved in a relationship. In fact, Chris still considers himself biblically married to Rhonda and continues to wear his wedding band. Chris has told his children as well as Simmons that he is still biblically married to Rhonda even though he is no longer married to her legally. Chris has referred to Simmons as the "imposter" and once asked the children to refer to Simmons as such. On two occasions, Chris told Simmons that he wanted to set up an appointment with Simmons, Simmons's minister, and himself so they could discuss Simmons's

relationship with Rhonda. Chris testified that Simmons's presence imposes on Chris's relationship with Rhonda, preventing any possible reconciliation.

{¶ 5} When the children are with their father, they regularly attend church on Sundays and engage in extensive bible study. Part of the bible study concerns passages in the bible about adultery. Although he denies calling Rhonda an adulteress, Chris has on many occasions told the children that if Rhonda and Simmons were having sex, they would be committing adultery. Chris has also told Ciara, his then ten-year-old daughter, that he does not want her (Ciara) to be an adulteress. Chris believes that it is his right to discuss such issues with the children. Chris does not believe that such discussion affects the children. Chris denied calling Rhonda a "slut" or a "whore." He admitted, however, telling the children that their mother is not appropriately dressed and asking them "what they thought about what kind of wife she [had] been to [him]" since the divorce. Chris testified that the children are very close to their mother and that Rhonda is a good mother.

{¶ 6} Rhonda testified that Chris cannot accept their 1998 divorce, that he is very bitter, and that he is taking the hostility out on the children. Rhonda also testified that Chris is a good man who loves his children. Rhonda testified that the children love their father but that they are fearful of him and that they do not like some of the things he does and says. Rhonda testified that the children often act up, start to cry, or work themselves into physical illness, especially Ciara, at the thought of going to visit their father. Rhonda stated that she often has to stop the car when driving to Chris's house to hug the children and to reassure them that everything will be all right. Rhonda testified that upon returning from Chris's house, the children are very upset, very clingy, and in need of attention. While she believes that Chris's visitation with the children should be supervised, Rhonda does not want to take Chris's parental rights away.

{¶ 7} Chris testified that when the children are dropped off at his house, they are happy to see him and hug him. Chris stated that the children love him and that they do not seem to be afraid of him. Rather, Chris believes that the children are brainwashed by Rhonda who is consistently trying to drive a wedge between the children and him. Chris does not believe that he has a problem with Ciara and describes their relationship as normal. Chris described his relationships with Cody and Chloe as good and very good respectively. Chris admits that he is not a perfect parent, that he has shortcomings, and that he could be more patient with and more encouraging to the children. Chris testified that he would refuse to participate in any court-ordered or voluntary counseling, including family counseling, because he does not need it.

{¶ 8} Two fellow churchgoers testified on behalf of Chris. They both testified that they never saw the children afraid of their father. One churchgoer stated

that he had never observed Chris hit his children or be mean or harsh to them. The other churchgoer observed signs of affection between the children and their father such as kissing and holding hands. Beverly Willis, Chris's mother, testified that Chris is a stern but very good father who is doing an exceptional job with the children. Willis testified that Ciara has commented, at times, about being in the middle of her parents' dispute. Willis stated that neither Ciara nor Chris needs counseling. Remarkably, despite the parties' animosity, visitation has continued in substantial compliance with the shared parenting agreement.

{¶ 9} During the hearing, upon questioning by the children's guardian ad litem, Chris also testified about the following incident that took place at his house: upon receiving his copy of the CDC report, Chris became upset about some of the children's allegations about him. Chris admitted that when the children walked in the front door for their weekend visitation with him, he started videotaping them, especially Ciara, asking them to recant some of the statements that were in the CDC report. Chris testified that he was feeling falsely accused and that videotaping the children was the only way to defend himself. Chris stated that videotaping the children and asking them to recant had no more of a negative impact on the children than someone else talking to them about it. Chris agreed, however, that the video camera could have a negative effect. Chris also testified that it was not inappropriate for him to discuss the false allegations in the CDC report with the children. Doing so did not put the children on the spot any "more than the psychologist puts them on the spot."

{¶ 10} During the hearing, the children's guardian ad litem testified and was cross-examined by counsel for both parties. Upon order of the magistrate, her testimony was subsequently sealed. The day after the hearing, the magistrate interviewed the children in camera. By decision filed April 13, 2001, the magistrate granted Rhonda's contempt motion regarding the children's unpaid medical expenses, granted Chris's contempt motion against Rhonda for failure to keep him informed of the children's extracurricular activities, denied both parties' contempt motion for failing to comply with the Schedule B visitation, and denied Chris's motion to increase his visitation. The magistrate also restricted Chris's visitation as follows:

{¶ 11} "The Schedule B order of visitation of Mr. Willis shall be restricted in that all visitation must be supervised by his parents, with their presence in Mr. Willis' home or within their home, at all times. This condition applies immediately.

{¶ 12} "Mr. Willis is required to contact Dr. Walters [of the CDC] for a recommendation for family counseling for himself and for his children. He is to follow through with any recommendations of Dr. Walters. * * * If Mr. Willis refuses to follow the recommendation of Dr. Walters and to participate in

counseling, * * * I recommend that his visitation rights be suspended until further order of the court."

{¶ 13} Chris filed objections to the magistrate's decision. By entry filed August 9, 2001, the trial court overruled Chris's objections and affirmed the magistrate's decision. This appeal follows in which Chris raises four assignments of error.

### Assignment of Error No. 1

{¶ 14} "In denying Chris Willis the opportunity to view the transcripts of the in camera testimony of his children, his constitutional due process rights were violated."

{¶ 15} The day after the hearing, the magistrate conducted in camera interviews with the children. Counsel were not allowed to attend the interviews. Chris argues that "[a]s a matter of his due process rights, [he] is entitled to access of the transcripts from his children's in camera testimony[.]" Chris contends that in light of his children's "propensity to exaggerate the truth or lie," and "[b]ecause counsel was not present, questions going to this line of questioning were not submitted and the testimony was not done through a closed circuit TV, the parties were not put on notice of any accusations made."

{¶ 16} At the outset, we take exception with Chris's contention that "questions going to this line of questioning were not submitted." At the end of the hearing, the magistrate asked counsel for both parties whether they wished to submit any questions or suggestions for her to consider in her in camera interviews. Chris's attorney asked whether he could put his suggestions on the record. He then told the magistrate, "[O]bviously the issues in this case from my client's perspective surround in some part the factual allegations attributed to the children in the CDC report, and we would request, your Honor, to ask the children about those, to try to determine * * * fact from fantasy. I don't think that the children made anything up, but sometimes, as the Guardian said, things get exaggerated. Obviously those are at the core of whether or not the children are fearful of dad, and whether or not that fear is well placed." Nothing further was requested.

{¶ 17} R.C. 3109.051 governs visitation rights and provides that "[i]n * * * resolving any issues * * * with respect to visitation rights * * *, the court, in its discretion, may interview in chambers any or all involved children regarding their wishes and concerns. [T]he interview shall be conducted in chambers, and no person other than the child, the child's attorney, the judge, any necessary court personnel, and, in the judge's discretion, the attorney of each parent shall be permitted to be present in the chambers during the interview. No person shall obtain or attempt to obtain from a child a written or recorded statement or

affidavit setting forth the wishes and concerns of the child regarding those visitation matters." R.C. 3109.051(C).

{¶ 18} In *Donovan v. Donovan* (1996), 110 Ohio App.3d 615, 674 N.E.2d 1252, we held as follows: "[W]e * * * hereby require trial courts to make a record of any *in camera* interview with children involved in custody proceedings, to be kept under seal for review on appeal * * *. We require that an audio recording, video recording or stenographic record be made and, in order to preserve the privacy of the setting, that no person other than the child and court personnel authorized by the judge be present with the judge in chambers. This will ensure that an appellate court can effectively review the trial court's decision pertaining to custody matters." Id. at 620, 674 N.E.2d 1252.

{¶ 19} Although the holding in *Donovan* applied solely to the recordings of in camera interviews with children involved in custody proceedings pursuant to R.C. 3109.04(B), it equally applies to R.C. 3109.051(C), which governs in-chambers interviews of children in visitation matters, and which language is identical to the pertinent language of R.C. 3109.04(B). See *In re Gilliam* (Mar. 30, 1998), Brown App. No. CA97–11–020, 1998 WL 142371.

{¶ 20} A review of the case law shows that Ohio appellate courts are split on the issue of whether a domestic relations court should be required to provide parents with the transcript of their child's in-camera interview. The Fourth Appellate District held that no statutory basis exists for denying parents access to the transcript of their child's in-camera interview. See *Inscoe v. Inscoe* (1997), 121 Ohio App.3d 396, 700 N.E.2d 70. By contrast, the Fifth and Ninth Appellate Districts held that parents are not entitled to the transcript of their child's in-camera interview. See *Patton v. Patton* (Jan. 9, 1995), Licking App. No. 94 CA 40, 1995 WL 42497; *In re Longwell* (Aug. 30, 1995), Lorain App. Nos. 94 CA 006006 and 94 CA 006007, 1995 WL 520058. Upon thoroughly reviewing both sides of the issue, and in light of the substantial amount of discretion granted to the trial court by R.C. Chapter 3109 in custody and/or visitation proceedings, we find the analyses of the Fifth and Ninth Appellate Districts to be persuasive and adopt them.

{¶ 21} In the case of *In re Longwell*, the Ninth Appellate District held, "We note initially that R.C. 3109.04 does not specifically state whether the parents of a child that is the subject of a custody dispute have a right to obtain a copy of a transcript of an in-camera discussion between the judge and the child. However, certain passages of the Revised Code shed some light on the issue.

{¶ 22} "The first sentence of R.C. 3109.04(B)(3) reads: 'No person shall obtain or attempt to obtain from a child a written or recorded statement or affidavit setting forth the child's wishes and concerns regarding the allocation of parental rights and responsibilities concerning the child.' During the in-camera

interview, the child supposedly makes known to the judge his or her wishes and concerns regarding custody. A transcript can be seen as a written or recorded statement setting forth the child's wishes and concerns. [The appellant's] attempt to gain access to the transcript could be interpreted as an attempt to obtain this statement in contravention of R.C. 3109.04(B)(3). * * * It would appear that the legislature intended to prohibit trial courts from relying on potentially fraudulent statements or affidavits produced by the parents. Instead, courts are to obtain the child's wishes and concerns directly from the child during the in-camera interview. * * *

{¶ 23} "R.C. 3109.04(B)(2)(c) reads: 'The interview shall be conducted in chambers, and no person other than the child, the child's attorney, the judge, any necessary court personnel, and, in the judge's discretion, the attorney of each parent shall be permitted to be present in the chambers during the interview.' This section clearly provides that the parents may not attend. Further, the parents' attorneys, [who] are no doubt highly partisan advocates of the parents' interests, may attend the interview only with the court's permission. The statute provides that only the child's attorney, an impartial representative of the child's interests, has the right to be present. This section, which in effect insulates the child from any extraneous influences during the interview, suggests that the General Assembly intended to create a 'stress-free environment * * * [so that] [c]hildren should display candor in setting forth their feelings' regarding custody. *Patton v. Patton* (Jan. 9, 1995), Licking App. No. 94 CA 40, unreported at 3 [1995 WL 42497]. Affording parents access to the transcript would contravene this intent. *Id.* The child would be less likely to be candid with the judge if the child knows that his or her parents will later read everything the child says.

{¶ 24} "The dissent in *Patton* argued that any semblance of confidentiality is illusory, because the child's choice of custodial parent will eventually be revealed in open court. * * * We think this confidentiality serves more fundamental purposes * * *. Domestic relations judges typically use the in-camera interview to discuss a wide variety of issues, including any problems the child may be having with parents, step-parents, siblings, etc. In this way, the judge can identify areas of potential trouble, and may discover, inter alia, that the intervention of a social worker is necessary, or that a new hearing on visitation should be held. We believe that judges should be allowed to keep their private conversations with the children of divorced parents confidential, as many times it is only this promise of confidentiality that convinces these embattled children to speak freely. If we were to accept [appellant's] invitation to declare such practices to be reversible error, we would in effect be depriving domestic court judges of an important tool in gathering information useful not only for making sound custody decisions, but also for addressing the problems of the whole family." *In re*

*Longwell* (1995), Lorain App. Nos. 94 CA 006006 and 94 CA 006007, 1995 WL 520058, at * 3–4, 1995 Ohio App. LEXIS 3825, at * 8–12.

{¶ 25}  The Fifth Appellate District, in turn, aptly noted that "[c]hildren should display candor in setting forth their feelings * * *.  The interview is recorded for the purpose of protecting the parties in that an appellate court may review the recorded interviews and determine whether undue influence has been exerted, or whether the court has made proper findings of fact regarding the in chambers interviews." *Patton,* Licking App. No. 94 CA 40, 1995 WL 42497, at * 3, 1995 Ohio App. LEXIS 357, at * 9.

{¶ 26}  We find that the foregoing analysis, combined with an appellate court's review of in-camera interviews of children, well protects the rights of the parents while at the same time ensures that children's statements made during the interview remain confidential.  We therefore hold that interviews of children conducted under R.C. 3109.051 are confidential and are not to be disclosed to the parents.  We further hold that the parents of a child that is the subject of a visitation dispute do not have the right of access to the sealed transcript of the in camera interview between the child and the judge.  See, also, *Beil v. Bridges* (July 13, 2000), Licking App. No. 99CA00135, 2000 WL 977221 (holding that based upon *Patton,* the sealing of transcripts of children's in-camera interviews did not violate the parents' due process rights).  Chris's first assignment of error is overruled.

Assignment of Error No. 2

{¶ 27}  "The trial court erred in affirming the magistrate's decision as the decision was against the manifest weight of the evidence."

{¶ 28}  Under this assignment of error, Chris first challenges the trial court's order that his visitation be supervised and that he attend counseling, as well as the denial of his motion to increase visitation.  Chris argues that the evidence in the record does not warrant a restriction of his visitation or the denial of his motion for increased visitation.  Chris contends that "the only 'evidence' presented was [Rhonda's] testimony that the modification is necessary as the children become physically and emotionally upset when they visit with their father."  Chris also contends that the videotaping incident does not warrant the trial court's decision: "feeling falsely accused," Chris was simply "trying to assert his due process rights outside the courtroom so that he was not deprived of his right to see his children without notice."

{¶ 29}  We note at the outset that under this assignment of error, Chris also implicitly argues that the denial of his motion for increased visitation is akin to a reduction of his visitation which in turn will prevent him from having frequent

contact with the children. However, the denial of a motion to increase visitation denies only an increase in visitation. It is not a de facto termination or reduction of the parent's visitation rights. Just because the trial court denied Chris's motion to increase visitation does not mean that Chris will not be able to maintain a relationship with the children, especially in light of the fact that he still has "Schedule B" visitation.

{¶ 30} It is well established that the trial court has broad discretion in determining matters related to visitation. See *Appleby v. Appleby* (1986), 24 Ohio St.3d 39, 24 OBR 81, 492 N.E.2d 831. In modifying visitation, the trial court is granted discretion limited only by the child's best interest. *Johntonny v. Malliski* (1990), 67 Ohio App.3d 709, 713, 588 N.E.2d 200. An appellate court reviews a trial court's determination of visitation rights under an abuse-of-discretion standard. *Booth v. Booth* (1989), 44 Ohio St.3d 142, 144, 541 N.E.2d 1028. Furthermore, if a trial court's determination is supported by competent, credible evidence, it will not be reversed by a reviewing court as being against the manifest weight of the evidence. See *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, and *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 10 OBR 408, 461 N.E.2d 1273.

{¶ 31} As previously noted, the parties and all three children were evaluated at CDC. All five persons were interviewed separately and each parent was observed with the children. The CDC report states:

{¶ 32} "Mr. Willis believes that Rhonda Stegner is harassing him. * * * He believes that his strengths as a parent have to do with his stability, his ability to set a good example for his children, his love for his children and his attempts to provide activities for them. His weaknesses are that he's sometimes not as patient as he should [be]. He believes he should be more encouraging and has 'said things about their mother I shouldn't.'

{¶ 33} "While [Mr. Willis's] approach to the test suggest[s] some defensiveness and difficulties looking within himself, this didn't invalidate the test results. Yet, such an approach * * * indicates a tendency to attribute blame and responsibility onto others with little appreciation for the role that he might play in problematic areas in his life. * * * Mr. Willis identifies his primary difficulties as a parent as impatience and lack [of] encouragement. His strong belief system might not allow him to be as flexible with three different children who might need to have the expectations for them adapted according to their needs, interests, social skills, and cognitive ability. While Mr. Willis verbalizes some recognition of this, he attributes most of the difficulties in his relationships with his children to others (i.e., Ms. Stegner and her mother). * * * His children consistently described him as critical, angry, and punishing. While attempting to communicate important family values, he also has to be able to nurture indepen-

dence, and reward successes as well as make his children aware of their mistakes, and enhance feelings of self-esteem.

{¶ 34}  "Chris Willis was observed with all three of his children[.]  * * * For the most part, the interaction could be best described as all three children engaged in separate, parallel play with Mr. Willis engaging in conversation with each about issues in their lives.  * * * The most animated of the three and the one who sought out the greatest contact with [her] father was Chloe.  * * * She appeared most comfortable with her father.  Ciara appeared the least comfortable although it's not clear to what extent this was affected by her physical health [she was ill that day] as opposed to emotional distance from her father.

{¶ 35}  "* * * Ms. Stegner presents as highly invested in the welfare of her children and expresses concerns about their anxiety and apparent fear of their father.  Certainly, the interviews with the children as well as observed interactions at [CDC] seem to support her report.  As such, she appears to be in touch with her children's feelings.  * * * For the most part, the children appeared comfortable with their mother and appeared to enjoy her attention."

{¶ 36}  With regard to Ciara, the CDC report noted that "Ciara also describes being placed in the middle of her parents' conflict by her father and adds that she 'don't feel good about it.'  * * * While she admits that she loves 'my mom and dad,' she doesn't like much of her father's behavior.  * * * Unfortunately, Ciara feels that it's 'all my fault my dad is mean,' and she ha[s] begun to internalize father's criticism as a sign of her defectiveness."

{¶ 37}  The CDC report concluded in part that "[t]he most consistent comment by all three children is their perception of their mother as warm and nurturing and father as critical and punishing.  * * * Mr. Willis has no insight into his social stimulus value and his relationship with his children.  He has little awareness of the impact that his anger has on their feelings for him, and his criticism has (at least in the case of Ciara) begun to affect her self-esteem, resulting in internalized feelings of defectiveness (i.e., that she's been the cause of father's anger and meanness).  Ciara is a bright, capable, and well-behaved youngster who does well in school.  She should feel good about herself and her accomplishments, not doubting herself.

{¶ 38}  "Mr. Willis attributes his difficulties in his relationships with his children to his ex-wife and ex-mother-in-law rather than accepting responsibility for his behavior and recognizing the need to change his parenting style.  Parents must tell children what behavior needs to be changed without communicating that they're inherently bad or defective.  Mr. Willis would benefit from treatment that would assist him in looking within himself, separating his own anger at his ex-wife from his behavior and toward treatment of his children.  He needs to achieve a better balance between setting limits and communicating his value

system while not demeaning his children and damaging self-esteem. His own anger and difficulty accepting the divorce needs to be parental business, and the children don't need to be drawn into a situation in which they must choose between one parent or the other. It would appear to be in the best interest of the children to have Mr. Willis participate in parent training in order to ensure the emotional safety and welfare of [the children]."

{¶ 39} Upon hearing the parties' testimony and the guardian ad litem's testimony, reviewing the CDC report, and interviewing the children in camera, the magistrate found that "Mr. Willis' own testimony confirms [part of the CDC report]; Mr. Willis expressed little or no concern about his discussion of sex in relation to bible studies and his repeatedly calling the mother of his children an adulteress. He has little or no appreciation or understanding as how this impacts his children based on their respective 'needs, interests, social skills and cognitive ability.' * * * [With regard to the videotaping incident], [o]nce again, Mr. Willis had little or no comprehension or understanding that he had done anything that might be harmful to his children. Rather, he felt it was his right 'to set the record straight' and require the children to recant these statements. * * * Mr. Willis refuses to participate in any counseling or evaluation, nor does he wish to participate in any family counseling. The Guardian Ad Litem strongly recommended some family counseling for Mr. Willis, with an introduction of the children into the counseling process."

{¶ 40} The magistrate also found that "[i]t was clear from the testimony and through my in camera interviews that the person who is primarily being affected by the actions of Mr. Willis and the conflict of their parents is * * * Ciara. I ordinarily do not refer to anything said during an in camera interview. I believe, in this case, it is necessary to refer to [the fact that] [a]ll three children believe that Mr. Willis is unfairly critical of Ciara[.]"

{¶ 41} After thoroughly reviewing the CDC report and the testimony presented at the hearing, and after carefully reviewing the transcript of the children's in-camera interviews and the testimony of the guardian ad litem submitted under seal, we find that the trial court did not abuse its discretion by denying Chris's motion to increase visitation and by ordering that his visitation be supervised and that he attend counseling. We further find that the trial court's foregoing decision is not against the manifest weight of the evidence.

{¶ 42} Chris also argues that the trial court erred by failing to appoint a third party to supervise his visitation. As previously noted, the trial court ordered that Chris's visitation be supervised by his parents at all times, either in his home or in their home. However, Chris's parents notified his attorney that they were unwilling to be used in such a fashion and that as a result, they refused

to supervise Chris's visitation. The trial court never appointed another supervisor.

{¶ 43} We agree with Chris that because of his parents' refusal to supervise his visitation and the trial court's failure to appoint another supervisor, Chris's visitation rights have essentially been terminated, albeit temporarily. We therefore remand the matter with instructions to the trial court to appoint another supervisor. In light of all of the foregoing, Chris's second assignment of error is overruled in part and sustained in part.

### Assignment of Error No. 3

{¶ 44} "This court should overturn the magistrate's and lower court's decision as the restriction on Chris Willis' parenting time was based on his religious beliefs and is a clear violation of his constitutional rights to freedom of religion under the First Amendment of the Constitution."

{¶ 45} Under this assignment of error, Chris argues that the trial court based its decision to restrict his visitation solely on his strongly held religious beliefs in violation of his constitutional right of freedom of religion under the First Amendment to the United States Constitution. Chris claims that the videotaping incident cannot be taken into account because he was simply trying to assert his due process rights. Chris also claims that his comments to the children about Rhonda's relationship with Simmons "are simply a reflection of his religious views, which include the Biblical teachings on adultery," and as such cannot be taken into account.

{¶ 46} The First Amendment has never been interpreted as an absolute proscription on the governmental regulation of religious practices. *Birch v. Birch* (1984), 11 Ohio St.3d 85, 86, 11 OBR 327, 463 N.E.2d 1254. While "[i]n addition to their free exercise rights, parents have a fundamental right to educate their children, including the right to communicate their moral and religious values[,] * * * a parent's actions are not insulated from the domestic relations court's inquiry just because they are based upon religious beliefs, especially actions that will harm the child's mental or physical health." *Pater v. Pater* (1992), 63 Ohio St.3d 393, 397–398, 588 N.E.2d 794. Thus, a parent may not shield his actions from the court's scrutiny by claiming religious motivations for those actions.

{¶ 47} There is no question that the paramount and overriding interests of R.C. 3109.051 are the best interests of the child and that it is the court's function to see that the child's best interests are protected. As a result, "a domestic relations court may consider the religious practices of the parents in order to protect the best interests of a child." *Pater*, 63 Ohio St.3d at 395, 588

N.E.2d 794. "This obligation of the court to consider the best interests of the children serves to protect them from emotionally unstable and fanatically misguided * * * parents, * * * while simultaneously safeguarding the parents' fundamental constitutional freedom to raise their children as they deem proper." *Birch,* 11 Ohio St.3d at 88, 463 N.E.2d 1254.

{¶ 48} This court has previously determined that a claim of violation of religious rights should be considered pursuant to a three-part test adopted by the Ohio Supreme Court in *State v. Schmidt* (1987), 29 Ohio St.3d 32, 29 OBR 383, 505 N.E.2d 627. *Hogan v. Hogan* (2000), 140 Ohio App.3d 301, 304, 747 N.E.2d 299. "The test is first, whether a defendant's religious beliefs are sincerely held; second, whether the regulation at issue infringes upon a defendant's constitutional right to freely engage in the religious practices; and third, whether the state has demonstrated a compelling interest for enforcement of the regulation and that the regulation is written in the least restrictive means." Id.

{¶ 49} Chris describes himself as a devout Christian who firmly believes in a literal reading of the Bible. We can concede that Chris's religious beliefs are sincere, but upon thoroughly reviewing the magistrate's decision, we find that Chris's argument that the restriction on his visitation rights violated his constitutional rights does not meet the second part of the test.

{¶ 50} Chris fails to satisfy the second part of the three-part test because he has not demonstrated that the restricted visitation infringes upon his constitutional right to freely engage in the Christian faith or that it interferes with his freedom to direct the upbringing and religious education of the children. We acknowledge that the magistrate's decision refers to Chris's extensive bible study with the children, which involves discussions about adultery and persons who are adulterers. The magistrate's decision also contains a statement, supported by the record, that Chris "expressed little or no concern about his discussion of sex in relation to bible studies and his repeatedly calling [Rhonda] an adulteress."

{¶ 51} Upon reviewing the magistrate's decision as affirmed by the trial court, we find that it addressed the visitation issue in the context of the children's best interests, and not based upon Chris's religious beliefs. Unlike in *Pater* where the noncustodial parent was prohibited from teaching or exposing the child to the Jehovah's Witnesses' beliefs during the parent's visitation, Chris is still free to instruct the children on his religious beliefs and to teach them as he sees fit. Certainly, the mere fact that visitation must be supervised and that he must attend counseling absolutely does not prevent him from "provid[ing] a moral upbringing for his children by sharing his religious beliefs." Nor is Chris prohibited or otherwise hindered from practicing his religious beliefs.

{¶ 52} Having found that Chris failed to satisfy the second part of the tripartite test, we need not determine whether he satisfied the third part. We

therefore reject Chris's argument that the trial court violated his constitutional rights under the First Amendment by restricting his visitation. Chris's third assignment of error is overruled.

Assignment of Error No. 4

{¶ 53} "The magistrate and trial court should have based contempt decisions on the evidence presented and ruled on all motions."

{¶ 54} Chris first argues that the trial court erred by denying his motion to find Rhonda in contempt for failing to comply with "Schedule B" visitation. Chris contends that Rhonda violated his "Schedule B" visitation by dropping the children off late on numerous occasions. Pursuant to the parties' shared parenting agreement, on Chris's alternate weekends, Rhonda was to drop off the children at Chris's house on Friday at 6:00 p.m. Chris, in turn, was to return the children to Rhonda's house at 6:00 p.m. on Sunday. As previously noted, both parties filed contempt motions for failing to comply with "Schedule B" visitation.

{¶ 55} In denying both motions, the magistrate noted that "[t]he parties disagree on what had been an oral agreement they reached following the divorc[e] concerning an adjustment in the return time for the children on Sunday evenings. [Rhonda] thought the agreement was an extension to 6:30, whereas [Chris] thought the extension was to 7:00 P.M. However, it was uncontroverted in the testimony that [Chris] never returns the children until 7:30 P.M. or following a church service[.] It was clear in testimony that [Chris] interprets Schedule B's 30 minute 'grace' period on visitation to be something he finds he is entitled to each visit rather than something that is to be used as it is intended, which is for situations when a party may be running late rather than an automatic extension of each visit by 30 minutes."

{¶ 56} Upon reviewing the parties' testimony at the hearing, we find that the record supports the magistrate's foregoing finding. It further supports the conclusion that following their divorce, the parties also orally and mutually agreed to modify Rhonda's drop-off times under the shared parenting agreement. We therefore find that the trial court properly overruled Chris's motion to find Rhonda in contempt for violating his "Schedule B" visitation.

{¶ 57} Chris next argues that the trial court erred by finding him in contempt for failing to pay the children's uncovered medical bills. Chris contends that he cannot be held in contempt because the shared parenting agreement, while ordering Chris to pay 70 percent of the children's uncovered medical expenses, fails to specify when Chris must reimburse Rhonda and how or when both parties are to be notified of payments.

{¶ 58} During the hearing, the parties stipulated that Chris owed Rhonda $1,602.42 in uncovered medical bills as of March 9, 2001. In finding him in

66

contempt, the magistrate stated that "[Chris] can purge his contempt by paying [Rhonda by April 2002]. If [Chris] does not pay this as ordered, then interest shall accrue at the rate of ten percent per annum, and he will be deemed not to have purged his contempt. If he does not purge, then I recommend he serve 30 days in the Butler County jail."

{¶ 59} At the outset, we find that the magistrate found Chris guilty of civil contempt. "Violations which are primarily offenses against the party for whose benefit the order was made, and where the primary purpose of the punishment is remedial or coercive and for the benefit of the complainant, are civil contempts, and the sanction must afford the contemnor the opportunity to purge himself of the contempt." *Tucker v. Tucker* (1983), 10 Ohio App.3d 251, 252, 10 OBR 364, 461 N.E.2d 1337. An appellate court will not reverse a trial court's decision in a contempt proceeding absent a showing of an abuse of discretion. *State ex rel. Ventrone v. Birkel* (1981), 65 Ohio St.2d 10, 11, 19 O.O.3d 191, 417 N.E.2d 1249.

{¶ 60} A similar argument to Chris's argument was made and rejected in *McFarland v. McFarland* (Oct. 21, 2001), Licking App. No. 01CA00021, 2001 WL 1468920, as follows:

{¶ 61} "The divorce decree was filed * * * some seventeen months prior to the motion for contempt on non-payment. As noted by the trial court, appellant admitted that he had not paid these debts. Absent a specific time in the divorce decree as to when the debts were to be paid, the trial court imposed a standard of 'reasonable length,' and found seventeen months to be unreasonable: In resolving the * * * debts, it is clear that the defendant was obligated to pay [the debts]. * * * The Court finds that in determining the defendant's compliance with the order, the common standard of reasonable length of time is appropriate. For the defendant to have paid nothing on [two debts] that he was ordered to pay nearly 18 months earlier is equivalent to disobedience of a Court order. The Court finds the defendant in contempt[.]" Id.

{¶ 62} In the case at bar, Rhonda testified that it had been almost two and one-half years since she had paid the uncovered medical expenses out of her pocket. Chris admitted that he had received copies of the children's uncovered medical expenses sent to him by Rhonda and that he had not paid them. Chris also admitted that he was now asking the court to give him a year to reimburse Rhonda the $1,602.42 in medical expenses he should have paid all along.

{¶ 63} The record clearly shows that Chris had notice of the uncovered medical expenses he was obligated to pay under the shared parenting agreement. Given his admission that he did not pay those expenses, and applying the common standard of reasonable length of time, we find that the trial court properly found Chris in contempt for failing to pay the children's uncovered medical expenses.

{¶ 64} Finally, Chris argues that the magistrate erred by failing to rule on his motion to find Rhonda in contempt for failing to keep him informed of the children's medical needs. The record shows that while the trial court ruled on a similar motion regarding Rhonda's failure to keep Chris informed of the children's extracurricular activities, it failed to address Chris's contempt motion regarding the children's medical needs. It is well-established that when a trial court fails to rule on a motion, the appellate court will presume the trial court overruled the motion. *Dozer v. Dozer* (1993), 88 Ohio App.3d 296, 303, 623 N.E.2d 1272.

{¶ 65} A review of the record shows that the parties' testimony on the "medical needs" issue is conflicting. Based upon the record before us, we cannot say whether the trial court properly overruled Chris's motion. Unlike appellate courts, trial courts are best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony. See *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 10 OBR 408, 461 N.E.2d 1273. We therefore remand the matter to the trial court to rule on Chris's contempt motion regarding Rhonda's failure to keep him informed of the children's medical needs. Chris's fourth assignment of error is overruled in part and sustained in part.

Judgment affirmed in part,
reversed in part
and cause remanded.

WALSH, P.J., and WILLIAM W. YOUNG, J., concur.