[Cite as *Compton v. Eckman*, 2012-Ohio-1506.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| LESLEY COMPTON, | ) | |
| | ) | CASE NO. 11 MA 94 |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| - VS - | ) | O P I N I O N |
| | ) | |
| STEVEN ECKMAN, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |


CHARACTER OF PROCEEDINGS:  Civil Appeal from Common Pleas Court,
Juvenile Division, Case No. 06JI548.


JUDGMENT:  Affirmed.


APPEARANCES:
For Plaintiff-Appellee:  Attorney Matthew Giannini
1040 South Commons Place, Suite 200
Youngstown, Ohio 44514


For Defendant-Appellant:  Attorney Lori Shells
5002 Westchester Drive #6
Youngstown, Ohio 44515


JUDGES:
Hon. Joseph J. Vukovich
Hon. Gene Donofrio
Hon. Cheryl L. Waite


Dated: March 30, 2012

VUKOVICH, J.

{¶1} Appellant Steven Eckman appeals the decision of the Mahoning County Juvenile Court which named appellee Lesley Compton as the residential parent of the parties' child. The father argues on appeal that the juvenile court's decision was contrary to the manifest weight of the evidence. Although there is plenty of evidence to support an award of custody to the father, we shall not substitute our judgment for that of the trial court. As the trier of fact occupied the best position from which to judge credibility and weigh the competing evidence, the judgment of the trial court awarding custody to the mother is affirmed.

STATEMENT OF THE CASE

{¶2} The parties dated in 2004. The mother gave birth to a daughter in August of 2005. The child tested positive for cocaine at birth, and a children's services case remained opened for six months. (Tr. 460-461, 528, 631). A judgment entry establishing the father's parentage was entered in June of 2006, and a $50 per month minimum support order was then established. The father visited the child during her first year and a half until the mother became unreachable.

{¶3} Specifically, at the end of 2006, the mother was arrested for fifth-degree felony possession of crack cocaine. She pled to the charge and agreed to participate in drug court. However, a month after the plea, she failed to appear for drug court. A warrant was issued for her arrest in March of 2007, and she did not turn herself in until January 13, 2009. Upon being sentenced to six months in prison, she left the child with the maternal grandfather.

{¶4} On February 23, 2009, the father filed a motion asking to be named the residential parent as the mother was in prison. He named both the mother and the maternal grandfather as parties. Although his sworn UCCJEA declaration provided his Minnesota address, the caption of his filings listed his prior address in Boardman, Ohio.

{¶5} On March 13, 2009, the father filed an emergency motion for interim custody stating that he wanted to insure that the child would receive appropriate medical treatment as the custody hearing was not scheduled until April. On March 17,

2009, the court granted the request for interim custody effective immediately. On March 19, 2009, the father went to the maternal grandfather's house with police officers and picked up the child. He then brought her home with him to Minnesota where he lived with his fiancée.

{¶6} On April 7, 2009, the mother filed a motion to show cause as the father failed to file a notice of intent to relocate out of state. In closed sessions, it was argued that a notice was not required because the father did not relocate. The motion was never ruled upon. The custody case was continued for various reasons throughout the next year. The custody trial proceeded before the magistrate on May 27, June 3, and August 13, 2010. In a September 16, 2010 decision, the magistrate recommended that the mother be named the residential parent and that the father receive standard long distance companionship rights.

{¶7} The magistrate opined that the father's motion was misleading because: it did not list his Minnesota address but instead listed a local address where he has not lived in nearly two years; it suggested the child needed medical treatment; and, it did not inform the court that the grandfather received the child through a power of attorney executed by the mother from prison. The magistrate expressed a belief that the way the father removed the child from the grandfather's house was disturbing because he brought police officers with him, took the crying child from the grandfather's arms, and drove her to another state to live with two people she barely knew. The magistrate concluded that these actions showed that the father does not have the best interests of the child at heart and that (despite the mother's past problems) she appeared to be the parent most likely to put the child's best interests first.

{¶8} The father filed timely objections from the magistrate's decision. The juvenile court decided to hold a trial de novo, which was conducted on April 6, 28, and 29, 2011. The father's prior attorney testified that his office mistakenly put the father's old Ohio address on the caption (which it had on record from the prior child support action) and noted that the father's affidavit attached to the motion showed the father's Minnesota address. (Tr. 32-34).

{¶9} The father's fiancée, Ms. Guhl, testified that she has been with the father for nearly six years and that they moved to Minnesota in February of 2008. (Tr. 37,

39). She stated that they are engaged to be married in March of 2012. Ms. Guhl testified that she makes $104,000 per year and provides financial support for the father and the child. (Tr. 86, 88). She said the father is a full-time student and works for a temporary agency at $10 per hour. (Tr. 63-65, 113). She noted that she pays for the child's coverage on her employer's health insurance. (Tr. 40, 70).

{¶10} When they first received custody, the three-year-old child was sick with a fever, swollen gums, and an odorous mouth due to her decayed teeth. The child had dental surgery in July of 2009. (Tr. 42). She now has to visit a dentist four times per year. (Tr. 43). The child has been seeing a counselor every two to three weeks since June of 2009; Ms. Guhl and the father participate in some sessions. (Tr. 43-44). Ms. Guhl explained that counseling was initiated because the child had nightmares and made unusual statements. (Tr. 44).

{¶11} At the time of the hearing, the child attended a daycare in the morning and kindergarten in the afternoon. (Tr. 45). The child went to church with them and was in the children's choir. The child was doing well in school and participated in play dates with other children. (Tr. 47). She also participated in ice-skating lessons. (Tr. 95). When asked if the mother could visit with the child after the hearing, Ms. Guhl expressed concern with allowing this and stated that they had plans. (Tr. 72, 75-76, 96).

{¶12} The father testified that he visited the child every couple weeks after her birth until Christmas of 2006. Thereafter, he did not know where the child was located. (Tr. 181). He stated that he did not consider filing a motion with the juvenile court during that time because he called the Child Support Enforcement Agency and figured that if that agency and the criminal court in Trumbull County could not find her and his daughter, then neither could the juvenile court. (Tr. 231).

{¶13} He filed for custody after the maternal grandfather called to advise him that the mother had been arrested and that the child was with him. (Tr. 233). The father said that when he removed the child from her grandfather, she calmed down nearly immediately when she realized who he was. (Tr. 183). He testified that nearly every time he came to Ohio for court, he brought the child and let her visit the mother. (Tr. 185). He said that the child stayed with the mother three weeks in the summer of

2010 and then he flew her to the mother for Christmas.  (Tr. 186).  He acknowledged that the child has grandparents, aunts, and cousins living in Ohio and no relatives living in Minnesota. (Tr. 290).

{¶14} Presumably, in response to opinions voiced by the court while questioning Ms. Guhl, the father testified that the child is in daycare at her old preschool for continuity and to prepare her for a full day of school in first grade.  (Tr. 187, 365).  The father testified that he has two other children.  His son was adopted by the paternal grandfather, and he has not spoken to him since he was one years old.  (Tr. 190).  His seventeen-year-old daughter is also in that grandfather's custody and, although he has the right to visit her, she does not wish to see him.  (Tr. 190-191).

{¶15} The father confirmed that he is a full-time student working toward a bachelor's degree with classes two evenings per week, has employment through a temp agency, but has not been able to reach the ninety-day retainment mark lately due to court appearances.  (Tr. 191-192).  He was receiving $100 per week in unemployment benefits at the time of the hearing.  (Tr. 267).  He disclosed that he had a 2004 conviction for driving under the influence, a 2006 insurance suspension, and eviction actions from 1998 and 2008.  (Tr. 276, 306-307).

{¶16} A letter from the child's therapist was presented where she opined that the child was adjusted to Minnesota and was anxious about staying overnight with her mother. The letter stated that the father disclosed that the child had nightmares and bedwetting issues after speaking to her mother on the telephone.  (Tr. 393-394).

{¶17} The child's maternal grandfather testified that the mother has changed in a positive way since 2008.  (Tr. 441).  He knew his daughter had been avoiding police before she surrendered herself in January of 2009.  (Tr. 432, 434).  He saw the child every three or four days before she was left with him.  (Tr. 446).  He testified that after his daughter was arrested, he called the father's attorney to reveal the child's situation.  (Tr. 427).  The child's father then called multiple times and spoke on the telephone with the child.

{¶18} The grandfather advised the father that if he wanted custody, he would have to go through the proper legal channels at which point the father filed for custody.  (Tr. 418).  The grandfather asked the father to visit before he exercised the court-

ordered custody, but the next day, the father called to say he would be arriving shortly with police to collect his daughter pursuant to the interim custody order. (Tr. 416, 419, 421). The child then heard her grandfather speaking to his wife about someone coming to get the child, but the child did not realize that they were speaking about her father so that when he showed up to take her, she was unaware of the relationship. (Tr. 417, 429). As such, she was fairly hysterical when her grandfather picked her up and handed her to her father. (Tr. 431).

{¶19} The maternal grandmother testified that when she visited the child in 2006, she was clean and fresh. (Tr. 484-485). She opined that the mother's apartment is currently very clean. (Tr. 488). She stated that she could assist in childcare. (Tr. 491).

{¶20} The mother claimed that the last time she used crack cocaine was September of 2008. (Tr. 459-460). She testified that she also used crack cocaine years ago and was dishonorably discharged from the military reserves in 1999 for drug use. (Tr. 541). She started using it again in September of 2004 and states that the father used it with her on weekends while they were dating. (Tr. 460). She acknowledged that she smoked crack cocaine while pregnant and that the child tested positive for cocaine at birth. (Tr. 460). To mislead caseworkers as to why the baby tested positive at birth, she told them that she allowed drug users to live in her house. (Tr. 557).

{¶21} The mother stated that she had a bench warrant for her arrest in 2006 for failing to pay fines on a conviction for identity theft. (Tr. 466-467). When pulled over on this warrant, she was arrested for driving under suspension, and drug paraphernalia was found in the trunk. (Tr. 467). This was her second drug paraphernalia charge. (Tr. 502). She was then pulled over a few months later at which point crack cocaine was discovered in her vehicle. (Tr. 467). The child was in the car during that stop and arrest. (Tr. 541-542). She signed up for drug court but absconded for two years.

{¶22} The mother acknowledged that the father visited the child in Austintown every few weeks for the first year. (Tr. 477-478). When she moved to Liberty in mid-August of 2006, the father visited every month. (Tr. 479, 545). She admitted that after

absconding from drug court, she called the father once to say they were fine but would not provide him with her new address. (Tr. 508). Her mobile telephone was disconnected a few months thereafter. (Tr. 511). She conceded that this denied the father the ability to visit. (Tr. 526-527, 547). She also admitted that even if he had somehow served her with papers for visitation or custody, she would not have appeared in court. (Tr. 543).

{¶23} The mother testified that since her release from prison she has been on regular medication for her bipolar condition and has another prescription she takes when she feels anxiety, panic attacks, or insomnia. (Tr. 454-455). She said that she was diagnosed as a severe manic-depressant. (Tr. 532). She sees a counselor every two to three weeks and a physician every month. (Tr. 455). She also takes a prescription anti-inflammatory two to four times a week for pain in her knees. (Tr. 457-458, 534).

{¶24} Three weeks before the hearing, she broke off an engagement with her live-in fiancé after being told that his presence would not be in the child's best interest. (Tr. 449). She explained that the guardian ad litem report showed that the fiancé had a misdemeanor arson conviction from 2000 of which she had been unaware. He also had a petty theft conviction and problems with marijuana. (Tr. 451, 532). She had previously told the guardian ad litem that this man would be watching the child while she went to work; he did not work as he was on disability for bipolar disorder, obsessive compulsive disorder, and ADHD. (Tr. 536, 552). She testified that she is in love with him, is still friends with him, and continues to attend counseling with him. (Tr. 554, 576).

{¶25} The mother disclosed that she has two other children who live in Georgia with their father. (Tr. 463). The son is now in the military, and she has not seen the daughter since December of 2005. (Tr. 540). She admitted that she tried to mislead the guardian ad litem by telling him that she regularly visited these children. (Tr. 566). As for visitation with the child at issue, she admitted that she was granted access to her daughter just about every time the father came in for court hearings. (Tr. 515).

{¶26} As for employment, she testified that she began as a temp in August of 2010 and was hired permanently in November of 2010 at $9 per hour working five

days a week from 3:00 p.m. to 11:00 p.m. (Tr. 453-454, 456). She would receive health insurance after a six-month probationary period. (Tr. 562). She stated that her father, who lives five minutes away, would watch the child while she was at work after the child got out of school. (Tr. 456). She had a request pending to work the day turn. (Tr. 568).

**{¶27}** The guardian ad litem recommended that custody be given to the mother. He testified that he believed the father's testimony was not accurate. (Tr. 593). He expressed disbelief that the father was going to marry his fiancée. (Tr. 610-611). He opined that the father has difficulty "making it on his own" without the assistance of a woman. (Tr. 594). He stated that the father has been resistant to providing visitation during the pendency of the proceedings. (Tr. 605). He noted that the child has expressed that she wants to live in Minnesota but believed that she was too young to make this decision. (Tr. 601). He stated that although the child is thriving in Minnesota and it would be a difficult transition for the child after more than two years of living in Minnesota with her father, she will get over it. (Tr. 603).

**{¶28}** The guardian ad litem stated that the mother has a neat and clean apartment, and her outward appearance has positively changed during the course of the proceedings. (Tr. 599-600). He pointed out that the mother tested negative for drugs at her clinic in 2008, 2009, and 2011. He opined that a "young lady" growing up should be in the care of her mother, making reference to puberty (although this child is five). (Tr. 610). He posited that it would be better for the actual mother, not the father's girlfriend, to act as the child's "mommy." (Tr. 611). He concluded that any risk of the mother relapsing or living with unsavory individuals is outweighed by these other considerations. (Tr. 613).

**{¶29}** On May 13, 2011, the court named the mother the residential parent and provided the father with standard long distance visitation, ordering him to deliver the child to the mother by June 11, 2011. The court found the father disingenuous during his testimony, stating that the father gave general testimony and when asked specifics, his testimony became conflicting and confusing. The court expressed that the father does not admit to any mistakes but readily points out the mother's errors.

{¶30} The court found that the mother was candid, honest, and remorseful. The court noted that she was previously dishonest with the guardian ad litem about her relationship to her two other children. The court found the parties very similar since both have used drugs (as the father did not rebut the mother's testimony that they used drugs when they were dating), had lapses in employment, and had issues with stable housing. The court concluded that the mother has made significant steps to address her issues as she works full-time, is in counseling, is addressing her mental health issues, terminated a relationship with a man found to be a negative influence on her child, and made babysitting arrangements in the event she receives custody.

{¶31} The court then stated that the father does not work and is dependent on his fiancée for financial support and housing. The court expressed concern that the father could not care for the child if his relationship ended. The court also found that the father's fiancée, not the father, was the child's primary caregiver and that she is the instigator of this custody action.

{¶32} The court noted the child's good relationship with the maternal grandfather, which was interrupted by her removal to Minnesota. The court noted that although the child was adjusted to her life in Minnesota, she was previously adjusted to her home here. The court acknowledged the mother's past crack cocaine addiction and her treatment for depression, anxiety, and bipolar disorder. The court opined that the father should have called children's services about the mother using drugs while pregnant or when he knew she was avoiding an arrest warrant.

{¶33} The court stated that the mother prevented visitation while trying to avoid her arrest warrant and failing to provide him with new addresses. The court then stated that the father did not regularly visit the child before the custody action. The court concluded that the mother is more likely to facilitate visitation and that the father has been reluctant to facilitate visitation. The court pointed out that the father is the child's only family member in Minnesota and his family lives in Ohio.

{¶34} The court also expressed disapproval of the way the father initially obtained custody in an abrupt manner with police officers, opining that there was never any indication that law enforcement would be needed. The court expressed that it was this abrupt departure and removal to live with people she barely knew which caused

the child to remain in counseling to this day. Although the court found that the father did not intend to deceive the court as to his residence, the court expressed that the interim custody order would not have been granted by the magistrate if it had been known that the father resided out of state and that the child was being cared for by the grandfather who had a power of attorney. The court found that the method of removal was telling of the father's attitude and lack of respect to the child's relationship with her mother and grandfather. The court also disapproved of the father baptizing the child while the mother was incarcerated.

**{¶35}** From the order naming the mother residential parent, the father filed a timely notice of appeal. His requests for stays of the custody order were denied by the trial court and this court.

ASSIGNMENT OF ERROR

**{¶36}** The father's sole assignment of error provides:

**{¶37}** "IT IS AGAINST THE MANIFEST WEIGH OF THE EVIDENCE TO TERMINATE APPELLANT'S CUSTODY ORDER AND GRANT CUSTODY TO APPELLEE."

**{¶38}** A trial court has broad discretion in its allocation of parental rights and responsibilities. *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). A reviewing court may not overturn a trial court's determination regarding the allocation of parental rights and responsibilities absent an abuse of discretion. *Pater v. Pater*, 63 Ohio St.3d 393, 396, 588 N.E.2d 794 (1992). An abuse of discretion implies that the trial court's decision was arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶39}** In general, the reviewing court is obliged to presume that the findings of the trier of fact are correct. *State v. Wilson*, 113 Ohio St.3d 382, 2007–Ohio–2202, 856 N.E.2d 1264, ¶ 24, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80–81, 461 N.E.2d 1273 (1984). This presumption arises in part because the fact-finder occupies the best position to watch the witnesses and observe their demeanor, gestures, and voice inflections and to utilize these observations in weighing credibility. *Id.* "A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the

trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not." *Id.* The general prohibition on reviewing courts substituting their factual judgment for that of the trial court is even more important in custody cases. *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997).

{¶40} "The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record." *Miller*, 37 Ohio St.3d at 74, citing *Trickey v. Trickey*, 158 Ohio St. 9, 13, 106 N.E.2d 772 (1952).

{¶41} In determining the best interest of a child regarding the allocation of parental rights and responsibilities, the court shall consider all relevant factors, including, but not limited to: (a) the wishes of the child's parents; (b) the child's wishes and concerns expressed in camera; (c) the child's interrelationship with the child's parents, siblings, and any other person who may significantly affect the child; (d) the child's adjustment to home, school, and community; (e) the mental and physical health of all involved; (f) the parent more likely to facilitate visitation; (g) any failure to make ordered child support payments; (h) convictions regarding an abused or neglected child, certain sex offenses, or certain domestic violence offenses and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused or neglected child; (i) whether the residential parent has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court; and (j) whether either parent has established a residence, or is planning to establish a residence, outside this state. R.C 3109.04(F)(1). Thus, we proceed through the factors.

{¶42} Here, each parent wished to have custody. *See* R.C. 3109.04(F)(1)(a) (wishes of parents). The child expressed that she wanted to live in Minnesota but was found too young to express her wishes as to custody. *See* R.C. 3109.04(F)(1)(b) (in camera interview). The child seems to interact well with both parents, the maternal grandfather, and the father's fiancée. The child has many relatives in the Youngstown

area and none in Minnesota besides the father. The child has two half-siblings living at her paternal grandfather's house in the Youngstown area. The two half-siblings on her mother's side live in Georgia. Neither parent has significant interaction with their other children. *See* R.C. 3109.04(F)(1)(c) (interactions with significant others).

{¶43} The child is well-adjusted to life in Minnesota where she had been residing for more than two years. The opinion was expressed that the child would adjust well to life in the Youngstown area, where she previously lived. The child attended half-day kindergarten and attended a day care the other half of the day. The child attended Sunday school, participated in the children's choir, and went to ice-skating classes in Minnesota. In Ohio, the child would begin first grade and when she returned home each weekday, her mother would be working until long past her bedtime. (Tr. 491). *See* R.C. 3109.04(F)(1)(d) (adjustment to home, school, and community).

{¶44} The mother is on regular medication for her bipolar disorder. She suffers panic attacks during which she must take another prescribed medication. She takes another prescription a few times a week due to knee problems. Most importantly, she is a drug addict, who was addicted to crack cocaine from 2004 through 2008 and had problems with the drug for years before that. She smoked crack during her entire pregnancy, and this child tested positive for cocaine at birth. *See* R.C. 3109.04(F)(1)(e) (mental and physical health). The mother avoided a serious children's service investigation by lying and saying that she let drug users stay at her residence (and presumably that she inhaled their second-hand crack smoke). As a result, the case was soon closed.

{¶45} Within months, the mother received two drug paraphernalia charges, an identity theft charge, and was arrested for felony possession of crack cocaine while her one-year old daughter was in the car. (This is not a similar history to the father's driving under the influence conviction from a year before this child was born or his traffic tickets.) A friend picked up the child from the scene, and no children's services case was started regarding this incident. The mother continued to use crack cocaine for the next two years while she hid herself and her daughter after absconding from

drug court. During this time, the child's teeth rotted away, causing her mouth to become infected and requiring serious dental surgery which the father instigated.

{¶46} As the mother admitted, during this time, she refused to provide the father with her address, she stopped communicating with him, and she had her mobile telephone turned off. *See* R.C. 3109.04(F)(1)(f) (likely to facilitate visitation). The mother then turned herself in and was sentenced to prison for six months. The father received interim custody for over two years during which the child thrived. Although the father was reluctant to allow visitation in Ohio right after the mother was released from prison, once the court issued an order, he then provided visitation to the mother on his regular court appearances in town. *See* R.C. 3109.04(F)(1)(i) (denial of parenting time *ordered by a court*). No parenting time problems resulted from the summer of 2010 visitation or the Christmas of 2010 visitation. *See* R.C. 3109.04(F)(1)(f) (likely to facilitate visitation).

{¶47} The father paid the child support as ordered even when the child was in hiding with the mother. *See* R.C. 3109.04(F)(1)(g). No relevant individuals committed any actions listed in R.C. 3109.04(F)(1)(h). Finally, the father has established a residence outside of the state. *See* R.C. 3109.04(F)(1)(j). As for other factors, as the court pointed out, both parties have had unstable housing and employment. The court found it significant that the mother had recently secured a full-time job. The court did not approve of the father's reliance on his fiancée's money and was concerned about how he could financially support the child if his fiancé (whom he had been dating for six years) broke up with him.

{¶48} In support of the father's position, we recognize that the child had been living and thriving in Minnesota with the father and his fiancée for over two years. She was covered by the fiancée's health insurance, attended school, participated in extracurricular activities, and had friends. That the father's fiancée is willing to be an involved step-mother weighs positively for the father. Furthermore, we would not equate the father's "criminal" history to that of the mother's. One OVI (prior to the child's conception) and some traffic tickets are not equivalent to two drug paraphernalia charges, felony possession of crack cocaine, and absconding from multiple bench warrants all during the child's lifetime plus an identity theft conviction

while pregnant. Moreover, the mother's claim that the father did drugs with her on weekends while they were dating (before she knew she was pregnant) does not equate to her act of smoking crack cocaine while about to give birth or her smoking crack for years thereafter while raising this child.

{¶49} We note that the mother acknowledged that she refused to provide the father with her new address, had her mobile phone disconnected, had a home phone under someone else's name, and would not have appeared for court even if he had been able to successfully serve her with custody or visitation papers. The mother also conceded that the father had bonded with the child and visited her regularly before the mother absconded. As the court found, the father did not intend to mislead the court as to his residence. Regarding the father's resistance to visitation after the mother was released from prison, we note that the court had not yet ordered it, and for all the father knew, she was a crack addict.

{¶50} We also acknowledge that use of the police during an initial custody transfer is not an uncommon tool used to preserve peace and protect oneself from accusations later. As the grandfather admitted, it was the child's misunderstanding of his explanation that caused the child to be unaware that it was her father who was coming to pick her up. As to the father's decision to baptize the child in the mother's absence, we note that the father contacted the maternal grandfather with whom the mother had provided a power of attorney over the child, and he not only consented but suggested a godmother who was close to the mother. Finally, we express concern with the guardian ad litem's personal belief that a "young lady" should be raised by her mother and that a father would not be able to cope with a daughter's puberty. (Tr. 610).

{¶51} Although the mother's history during the child's life is a major obstacle, the juvenile court believed that she has changed and trusts that she will not relapse. The court was impressed with her stability and her honesty. The court found the father's testimony lacked credibility and that the mother was candid and remorseful. Specifically, the juvenile court found the father disingenuous during his testimony on the reason for the child's counseling, his financial situation, the number of hours he worked and attended school, the reason for daycare, his visitation concerns, his

custody relations with his other children, his marriage plans, his prior eviction cases, and the disagreement over the Christmas of 2010 travel expenses.

{¶52} The trial court occupied the best position to make these judgments. The court viewed the demeanor, voice inflection, eye movements, and gestures of the witnesses as they testified and found that the child's best interests would be best served if custody were provided to the mother. Notably, the magistrate also found that custody to the mother would be in the child's best interests, and the trial court held a trial de novo and came to the same conclusion based upon its impressions of the father's sincerity and credibility. Based upon our instructions to restrain from second-guessing the credibility and weighing decisions of the trial court in custody matters, we affirm the trial court's decision in this case.

Donofrio, J., concurs.
Waite, P.J., concurs.