[Cite as *Via v. Boyle*, 2025-Ohio-5363.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

PREBLE COUNTY


| | | |
|---|---|---|
| JOSH VIA, | : | |
| | | CASE NO. CA2025-04-005 |
| Appellee, | : | |
| | | OPINION AND |
| | : | JUDGMENT ENTRY |
| - vs - | | 12/1/2025 |
| | : | |
| TOSH (VIA) BOYLE, | : | |
| Appellant. | : | |


APPEAL FROM PREBLE COUNTY COURT OF COMMON PLEAS
DOMESTIC RELATIONS DIVISION
Case No. 19DR007226


Chloe E. Kirby, for appellee.

Tosh (Via) Boyle, pro se.


## O P I N I O N


**M. POWELL, J.**

{¶ 1}  Appellant, Tosh Boyle ("Mother"), appeals from the decision of the Preble

County Court of Common Pleas, Domestic Relations Division, terminating the parties' shared-parenting plan, designating appellee, Josh Via ("Father"), residential parent and sole legal custodian of the parties' minor child, and ordering Mother to pay child support. For the reasons outlined below, we affirm.

## I. Factual and Procedural Background

{¶ 2}   Mother and Father are the divorced parents of a minor child born April 13, 2016. The trial court dissolved their marriage by decree filed November 27, 2019, and approved a shared-parenting plan on the same date. Under this original arrangement, both parents were designated as residential parents with equal parenting time on a week-on, week-off schedule, exchanging the child on Fridays by pickup from school.

{¶ 3}   On June 29, 2021, an agreed order was entered modifying certain aspects of their arrangement. Although neither parent resided within Valley View Local Schools' district boundaries, they agreed that the child would attend that district with the parties equally splitting tuition costs. They also agreed to eliminate the midweek visit that had been part of their original schedule and established a child support order of zero dollars. Father provides the child's health insurance.

{¶ 4}   Following the divorce, Mother relocated frequently, while Father maintained stable housing. The record establishes that Mother moved nine times since the parties' separation and eight times since January 2019. Father, by contrast, has continuously resided in West Alexandria, Ohio. Before her most recent relocation, Mother had been employed at KW Flooring for approximately four years, earning between $70,000 and $80,000 annually.

{¶ 5}   In January 2023, Mother met Kevin Boyle. They married in August 2023, and Mother subsequently relocated to Aurora, Indiana, to live with her new husband on his rural property. Aurora is approximately ninety minutes from both the child's school and

Father's residence. In October 2023, approximately two months after her relocation, Mother voluntarily left her employment at KW Flooring when the company eliminated remote work options. At the time of trial, Mother was entirely financially dependent upon her husband's income from self-employment and veterans' disability benefits. Mother testified that she left employment to focus on the family and pursue a more self-sufficient lifestyle on her husband's rural property, where she has been homeschooling her three stepchildren from her marriage to Boyle.

{¶ 6} Mother's relocation to Indiana created substantial practical difficulties with the existing shared parenting arrangement. During Mother's parenting time, the child faced a three hour daily round-trip commute to and from school. The record shows that the child was tardy 32 times during the prior school year while living with Mother. The extended distance also forced the child to discontinue participation in gymnastics, an activity she had enjoyed. At the time of trial, the child was in second grade and had recently turned nine years old in April 2024. Educational concerns arose regarding the child's academic performance, with testimony indicating that the child was testing at low levels, though her current grades reflected A's and possibly B's.

{¶ 7} Following Mother's remarriage, disputes arose concerning religious practices. Mother's Christian beliefs changed, leading her to conclude that certain holidays should not be celebrated as they historically had been in the family. Specifically, Mother kept the child home from school on Halloween, preventing her from participating in the school Halloween party, and changed her position regarding Christmas celebrations. Father testified that the child came to him with questions about holidays because she appeared confused about what to think and believe since Mother's remarriage. Father described Mother as having gone "down a rabbit hole of extremism that never existed before." On cross-examination, however, Father acknowledged that he

does not object to Mother celebrating holidays differently than him and agreed that a child can healthily view holidays from each parent's perspectives and decide how she wants to celebrate when she is older. Father's expressed concern centered not on Mother's religious practices themselves but on her characterization of his practices as "bad" and her unilateral implementation of changes without advance notice or discussion with him.

{¶ 8} Communication difficulties between the parties intensified significantly after Mother's remarriage. Mother insisted that Father communicate with both her and her new husband, Kevin, regarding matters concerning the child. Father refused, maintaining that communication should occur between the child's biological parents only. These disagreements extended to practical matters including school choice, with Father preferring continued public-school attendance while Mother suggested homeschooling to address the commuting difficulties created by her relocation. The parties also could not agree on appropriate locations for parenting time exchanges.

{¶ 9} On September 22, 2023, Father filed a motion to modify the shared-parenting plan, or alternatively, to reallocate parental rights and responsibilities, along with a motion to modify child support. On November 21, 2023, the court appointed Attorney Michelle Maciorowski as guardian ad litem ("GAL"). Attorney Maciorowski had previously served as the child's GAL, giving her familiarity with the family dynamics.

{¶ 10} On December 13, 2023, the GAL filed a notice of intent to visit Mother's home by video, to which no objections were filed. On February 19, 2024, the GAL submitted her report recommending that shared parenting be terminated and that Father be designated the child's legal custodian, with Mother receiving parenting time under the court's standard order for parties residing more than 45 miles apart.

{¶ 11} A trial was conducted on April 4, 2024, before a magistrate. Both parties testified, along with the GAL. Mother appeared pro se, having waived her right to counsel

- 4 -

at the hearing's outset.

{¶ 12} Father testified regarding his stable employment in business roofing and exteriors, earning between $58,000 and $62,000 annually on a commission basis. He emphasized the communication breakdown between the parties, their fundamental disagreements about religion and school choice, and his belief that he represented the more stable parenting option. Father sought termination of the shared-parenting plan and designation as residential parent and legal custodian, with Mother receiving parenting time every other weekend through Monday morning school drop off, and week-on, week-off parenting during summer breaks.

{¶ 13} Mother testified about her decision to relocate to Indiana, explaining her desire to pursue a more self-sufficient lifestyle on her husband's rural property. She acknowledged the driving challenges created by the relocation but proposed alternative arrangements, including homeschooling to eliminate the commuting issue. Mother offered a revised parenting schedule whereby Father would have the child every school day with Mother having weekends during the school year, reversing during summer break.

{¶ 14} The GAL testified that her recommendation remained unchanged after hearing the parties' testimony. She noted that communication between the parties had deteriorated beyond repair, extending beyond their religious differences. The GAL testified that while there is no problem with Mother's religious beliefs themselves, those beliefs should be discussed between parents, and that good communication happens when parents consult with one another and jointly make decisions before giving their child unrealistic expectations. Her investigation revealed that Mother decided to make changes for herself, pulled the child along, and did not notify Father. The GAL also testified that the child loves both of her parents and wants to spend as much time as possible with them.

{¶ 15} On June 24, 2024, the magistrate issued a decision terminating the shared-parenting plan, designating Father as the child's residential parent and legal custodian, and establishing a parenting-time schedule for Mother. The magistrate stated unequivocally that she had no concerns about how Mother chooses to celebrate or not celebrate holidays, but found that the communication with Father about those holidays and how things were explained to the child was severely lacking. The magistrate also imputed income of $70,000 annually to Mother for child-support calculation purposes, finding that she was voluntarily unemployed because she quit her job making $70,000 per year even though she could have worked from home. The magistrate recommended that Mother pay monthly child support to Father.

{¶ 16} Mother filed objections to the magistrate's decision. On April 10, 2025, the trial court overruled Mother's objections and adopted the magistrate's decision.

{¶ 17} Mother appealed.

## II. Analysis

{¶ 18} Mother, who has appealed pro se, assigns three errors to the trial court. She challenges the consideration of her religious practices, the imputation of income to her, and the GAL's alleged non-compliance with Sup.R. 48.03.

### A. Constitutional Challenge Based on Religious Freedom

{¶ 19} The first assignment of error alleges:

> The trial court violated Appellant's constitutional rights under the First and Fourteenth Amendments by improperly considering Appellant's religious practices in its custody determination.

{¶ 20} We review constitutional questions de novo while applying an abuse-of-discretion standard to the underlying custody determination. *Pater v. Pater*, 63 Ohio St.3d 393, 396 (1992). While we find concerns with aspects of the trial court's analysis, we

conclude that the custody modification rests on substantial evidence wholly independent of religious considerations.

### 1. The Constitutional Standard

{¶ 21} The First Amendment's Free Exercise Clause, applicable to state courts through the Fourteenth Amendment, protects parents' fundamental right to direct their children's religious upbringing. *Wisconsin v. Yoder*, 406 U.S. 205 (1972). Article I, Sections 7 and 20 of the Ohio Constitution provide parallel protections. The Ohio Supreme Court established the governing standard in *Pater v. Pater*: "A parent may not be denied custody on the basis of religious practices unless there is probative evidence that those practices will adversely affect the mental or physical health of the child." *Pater* at 396.

{¶ 22} This standard serves two purposes. It preserves individual religious liberty while preventing courts from becoming theological arbiters. Courts may neither favor one religion over another nor ground custody decisions in disapproval of religious beliefs or practices. As the United States Supreme Court has recognized, "Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984).

{¶ 23} The *Pater* decision directly addressed circumstances remarkably similar to those presented here. The mother in that case was a Jehovah's Witness whose religious beliefs prohibited celebrating birthdays and holidays, saluting the flag, and participating in various social activities. *Pater*, 63 Ohio St.3d at 395. The father argued that these restrictions would cause the child to be socially ostracized and would harm his development. *Id*. The Ohio Supreme Court firmly rejected these concerns, holding that "even if we accept the premise that [Mother] will actively forbid [the child] to celebrate holidays, be involved in extracurricular activities, or salute the flag, these practices do not

appear to directly endanger the child's physical or mental health." *Id*. at 399.

{¶ 24} The Court emphasized that "a showing that a child's mental health will be adversely affected requires more than proof that a child will not share all of the beliefs or social activities of the majority of his or her peers." *Id*. Courts must base decisions that religious practices will harm a child on concrete evidence, not speculation about social consequences. The Court specifically rejected the argument that prohibiting holiday celebrations constitutes a permissible basis for custody determinations absent probative evidence of actual harm to the child's mental or physical health.

{¶ 25} At the same time, Ohio law explicitly requires courts to consider "the ability of the parents to cooperate and make decisions jointly" when determining whether shared parenting serves the child's best interests. R.C. 3109.04(F)(1)(j). This statutory requirement creates a framework for addressing disputes that may involve religious differences without impermissibly evaluating religious content itself. As we have recognized, courts "'may consider the religious practices of the parents in order to protect the best interests of a child.'" *Suwareh v. Nwankwo*, 2018-Ohio-3737, ¶ 29 (12th Dist.), quoting *Pater* at 395. But they "may not restrict a parent's right to expose his or her child to religious beliefs, 'unless the conflict between the parents' religious beliefs is affecting the child's general welfare.'" *Id*., quoting *Pater* at paragraph two of the syllabus.

{¶ 26} The constitutional inquiry thus requires careful distinction between protected religious exercise and conduct that affects parental cooperation. Religious differences may be treated as symptoms of broader communication failures rather than as primary bases for custody decisions. *deLevie v. deLevie*, 86 Ohio App.3d 531, 541 (10th Dist. 1993). The critical distinction recognizes that while a parent possesses an absolute right to modify religious practices, that parent lacks any right to implement those changes affecting a shared child without appropriate consultation with the other parent.

## 2. The Distinction Between Beliefs and Conduct

{¶ 27} Mother contends that the trial court violated her federal constitutional rights by improperly weighing her religious practices in modifying custody arrangements. This argument rests on a misreading of the magistrate's decision. And a careful review of the record demonstrates that the trial court properly distinguished between Mother's protected religious beliefs, which it explicitly declined to criticize, and her problematic manner of implementing those beliefs without consulting Father.

{¶ 28} The magistrate's decision contains no impermissible theological inquiry. To the contrary, the magistrate stated unequivocally: "The undersigned has no concerns about how mother chooses to celebrate or not celebrate." This language directly addresses the constitutional protection that *Pater* requires. The magistrate recognized Mother's absolute right to modify her religious practices and to raise the child according to her religious beliefs during her parenting time. The decision neither evaluates the merit of Mother's religious views nor suggests that her beliefs are inappropriate or harmful.

{¶ 29} Mother points to testimony in the record that she characterizes as evidence of religious discrimination. Specifically, Father testified that Mother had gone "down a rabbit hole of extremism." The GAL testified that Mother "has gone to a more rigid idea of what is okay to worship." But these statements represent witness testimony, not judicial findings or analysis. The magistrate did not adopt this characterization or use such language in the decision. The relevant inquiry examines what the court actually relied upon in reaching its decision, not what testimony it heard.

{¶ 30} The magistrate's analysis focused not on the content of Mother's religious beliefs but on her failure to communicate with Father about implementing changes that affected their shared child. The decision notes that Mother "didn't let Child participate in a Halloween party at school" and "changed her position on celebrating Christmas," but

- 9 -

immediately follows with the critical point: "the communication with father about those holidays and how things were explained to Child is severely lacking." This framing demonstrates the magistrate's proper focus on cooperation failures rather than religious content.

{¶ 31} The record supports this distinction. Father testified on cross-examination that he "doesn't object to [Mother] celebrating holidays differently than him." He agreed that "a child can 'healthily' view holidays from each parent's perspectives and decide how she wants to celebrate when she's older." His concern centered not on Mother's religious practices themselves but on her characterization of his practices as "bad" and her unilateral implementation of changes without advance notice or discussion.

{¶ 32} The evidence established that Mother kept the child home from school on Halloween without informing Father in advance. She changed long-standing Christmas traditions that both parents had previously shared with the child without discussing the change with Father. She insisted that Father communicate through her new husband about matters concerning their shared child. These actions represent failures of the collaborative decision-making that shared parenting requires.

{¶ 33} The GAL testified that while "there is no problem with the religious beliefs," those beliefs "should be discussed between parents." The GAL explained that "good communication happens when parents consult with one another and jointly make decisions before giving their child unrealistic expectations." Her investigation revealed that "mother decided to make changes for herself; pulled Child along, and did not notify Josh." This testimony focuses squarely on procedural failures in co-parenting rather than on the substance of Mother's religious beliefs.

{¶ 34} Ohio law permits precisely this type of analysis. In *Tsolumba v. Tsolumba*, 2006-Ohio-5595, ¶ 31 (9th Dist.), the court explained that "the crucial distinction lies

between the court's treatment of religious belief and its inquiry into religiously motivated actions." While courts may not burden a parent's choice of religious belief by refusing to award custody on that basis, "a parent cannot shield her actions from the court's scrutiny by claiming religious motivation for those actions." *Id*. The court may examine how a parent's religiously motivated conduct affects the ability to cooperate in shared parenting without impermissibly evaluating the religious beliefs themselves.

{¶ 35} The distinction matters because successful shared parenting depends upon effective communication and cooperation between parents. R.C. 3109.04(F)(1)(j) specifically requires courts to consider "the ability of the parents to cooperate and make decisions jointly." When one parent makes unilateral decisions affecting significant aspects of the child's daily life, whether motivated by religious conviction or other reasons, shared parenting becomes unworkable. The constitutional protection for religious exercise does not exempt a parent from the obligation to consult and cooperate with the other parent regarding decisions affecting their shared child.

### 3. Evidence of Communication Breakdown

{¶ 36} The record establishes extensive evidence of communication breakdown between the parties that extends well beyond religious matters. The GAL testified that communication between the parties had "deteriorated to the point that shared parenting was no longer in the best interest of the child" and was "beyond repair." Father testified that their communication has "failed dramatically." These professional and party assessments reflect fundamental cooperation failures that make shared parenting unworkable.

{¶ 37} The communication breakdown manifests in multiple areas. The parties disagree about school choice, with Father preferring continued public school attendance while Mother suggested homeschooling to address commuting difficulties created by her

relocation. They cannot agree on appropriate locations for parenting time exchanges. Mother insists that Father communicate through her new husband regarding matters concerning their shared child, while Father maintains that communication should occur between the child's biological parents only.

{¶ 38} The parties' religious differences contribute to these broader communication failures but do not constitute the sole or primary basis for terminating shared parenting. As the Tenth District has recognized, religious differences may serve as symptoms of broader communication failures without becoming impermissible bases for custody modification. *deLevie*, 86 Ohio App.3d at 541. The key inquiry examines whether the parents can effectively cooperate in making joint decisions about their child's upbringing, regardless of what factors contribute to their inability to cooperate.

{¶ 39} Mother's pattern of unilateral decision-making provides substantial evidence that shared parenting had become unworkable. She made the decision to relocate 90 minutes from the child's school without adequate consultation regarding the practical implications for their shared parenting arrangement. She kept the child home from school for Halloween activities without advance notice to Father. She changed long-standing family traditions regarding Christmas celebrations without discussing the changes with Father beforehand. She unilaterally decided that Father must communicate through her new husband rather than directly with her.

{¶ 40} These actions demonstrate a fundamental inability to engage in the collaborative decision-making that shared parenting requires. The statutory framework explicitly mandates consideration of "the ability of the parents to cooperate and make decisions jointly." R.C. 3109.04(F)(1)(j). When one parent repeatedly makes significant decisions affecting the child without consulting the other parent, the court properly concludes that shared parenting no longer serves the child's best interests.

**4. The Abuse-of-Discretion Standard Supports Affirmance**

{¶ 41} The abuse of discretion standard requires substantial deference to trial court determinations in custody matters. As this court has recognized, "the power of the trial court to exercise discretion is peculiarly important in proceedings involving the custody and welfare of children." *Grover v. Dourson*, 2019-Ohio-2495, ¶ 15 (12th Dist.). A reviewing court will not overturn a custody determination unless the trial court has acted in a manner that is arbitrary, unreasonable, or capricious. *Pater*, 63 Ohio St.3d at 396.

{¶ 42} The trial court's decision reflects proper application of constitutional principles within the framework of Ohio's shared-parenting statute. The magistrate explicitly stated that she had no concerns about how Mother chooses to celebrate or not celebrate holidays, demonstrating awareness of constitutional limitations on religious inquiry. The decision focuses on communication failures and practical difficulties rather than on the content of Mother's religious beliefs. The trial court's subsequent adoption of the magistrate's decision, combined with its clarification that the decision rested on communication failures rather than religious discrimination, provides additional assurance that the custody modification rested on permissible grounds.

{¶ 43} Substantial evidence supports the conclusion that shared parenting had become unviable. The GAL's recommendation, based on extensive investigation including interviews with both parents and the child, provided independent professional support for this conclusion. The GAL had previously served in the same role for these parties, giving her unique insight into the family dynamics and how they had deteriorated. Her testimony that communication had deteriorated "beyond repair" and that shared parenting was "no longer in the best interest of the child" carries substantial weight given her professional expertise and familiarity with the family.

{¶ 44} The trial court properly balanced Mother's constitutional right to religious

- 13 -

exercise against the statutory requirement that shared parenting arrangements serve the child's best interests. The decision neither penalizes Mother for her religious beliefs nor restricts her ability to practice her religion during her parenting time. Instead, it recognizes that shared parenting requires a level of cooperation and communication that the parties could no longer maintain, for reasons that extend well beyond their religious differences.

### 5. Conclusion

{¶ 45} The constitutional principles that *Pater* established protect parents' fundamental right to direct their children's religious upbringing. Those principles prohibit courts from denying custody based on religious practices absent probative evidence of harm to the child's mental or physical health. The trial court's decision respects these constitutional boundaries by focusing on communication failures and practical difficulties rather than on the content of Mother's religious beliefs.

{¶ 46} The magistrate explicitly declined to criticize Mother's religious choices, stating unequivocally that she had no concerns about how Mother chooses to celebrate or not celebrate holidays. The decision addresses Mother's failure to communicate and cooperate with Father regarding the implementation of changes affecting their shared child, not the religious beliefs that motivated those changes. This distinction keeps the decision within constitutional bounds while properly applying Ohio's statutory requirement that shared parenting depends upon the ability of parents to cooperate and make decisions jointly.

{¶ 47} Mother possessed an absolute right to modify her religious practices and to raise the child according to her religious beliefs during her parenting time. The trial court's decision neither restricts that right nor penalizes Mother for exercising it. But Mother's constitutional right to religious exercise did not exempt her from the obligation to communicate and cooperate with Father regarding decisions affecting their shared child.

Her failure to meet that obligation, combined with other factors rendering shared parenting unworkable, provides adequate grounds for the custody modification.

{¶ 48} The first assignment of error is overruled.

## B. Imputation of Income

{¶ 49} The second assignment of error alleges:

> The trial court abused its discretion by imputing income to Appellant without making the required factual findings and applying the standards set forth in R.C. 3113.215(A)(5).

{¶ 50} Mother's second assignment of error contends that the trial court abused its discretion by imputing $70,000 in annual income to her without adequately determining whether she was voluntarily unemployed and without properly considering the mandatory statutory factors set forth in R.C. 3119.01(C)(18)—not former R.C. 3113.215(A)(5), cited by Mother, which has been repealed.[1] This assignment of error presents a close question. Mother advances substantial arguments that her decision to leave employment served legitimate family interests when her new husband's income provided adequate support for the child. Nevertheless, after reviewing the record and applicable law, we conclude that the trial court did not abuse its discretion.

{¶ 51} We review a trial court's determination regarding child support, including the imputation of income, for an abuse of discretion. *Rock v. Cabral*, 67 Ohio St.3d 108, 110 (1993). Both whether a parent is voluntarily unemployed and the amount of income to be imputed are factual matters determined by the trial court based on the circumstances of each case. *Justice v. Justice*, 2007-Ohio-5186, ¶ 7 (12th Dist.). "An abuse of discretion requires this court to find the domestic relations court acted unreasonably, arbitrarily or unconscionably." (Citation omitted.) *Mann v. Muktarian*, 2025-Ohio-4404, ¶ 9 (12th Dist.).

---

1. Former R.C. 3113.215 was repealed in 2001, and the language regarding "potential income" now appears in R.C. 3119.01. *Ayers v. Ayers*, 2024-Ohio-1833, ¶ 19.

"The vast majority of cases in which an abuse of discretion is asserted involve claims that the decision is unreasonable." *Bonifield v. Bonifield*, 2021-Ohio-95, ¶ 11 (12th Dist.). A decision is not unreasonable merely because the reviewing court would have reached a different conclusion; it is unreasonable only when no sound reasoning process supports it. *Nwafo v. Ugwualor*, 2024-Ohio-189, ¶ 11 (12th Dist.).

**1. The Statutory Framework for Income Imputation**

{¶ 52} R.C. 3119.01(C)(18) establishes a two-step framework for imputing income. First, the court must make an express determination that the parent's unemployment is voluntary. Second, if voluntary unemployment is established, the court must determine the appropriate amount of income to impute by considering specific statutory factors.

{¶ 53} The statutory definition of "potential income" applies specifically to "a parent who the court pursuant to a court support order determines is voluntarily unemployed or voluntarily underemployed." R.C. 3119.01(C)(18). When voluntary unemployment is established, courts must consider eleven specific factors in determining the appropriate amount of imputed income. R.C. 3119.01(C)(18)(a)(i)-(xi).

{¶ 54} The Ohio Supreme Court clarified these requirements in *Ayers v. Ayers*, 2024-Ohio-1833. The Court held that "the plain language of R.C. 3119.01(C)(18) requires that the domestic-relations court's order include an express determination of voluntary unemployment as a condition precedent to imputing potential income for child-support-calculation purposes." *Id.* at ¶ 1. This express determination cannot be implied from other findings; the court must affirmatively find that the parent's unemployment is voluntary before proceeding to calculate imputed income. But *Ayers* does not require any particular formulation or extended analysis. The determination must be express, but "that provision does not require a recitation of particular words" so long as the order "clearly evince[s] a finding that a parent's unemployment or underemployment is voluntary." *Id.* at ¶ 21.

{¶ 55} Here, the trial court made the required express finding. The magistrate's decision stated that Mother "is voluntarily unemployed. She quit her job, making $70,000 per year, even though she could have worked from home." The trial court adopted this finding and elaborated in its entry overruling Mother's objections: "[Mother] left this job voluntarily. She is voluntarily unemployed." While these findings are not extensive, they satisfy *Ayers*'s requirement for an express determination. The trial court clearly evinced its finding that Mother's unemployment was voluntary.

**2. The Objectively-Reasonable-Basis Standard**

{¶ 56} Having expressly found voluntary unemployment, we must determine whether that finding constituted an abuse of discretion. Ohio courts apply an objectively-reasonable-basis standard to such determinations. "'[T]o avoid the imputation of potential income, the parent must show an objectively reasonable basis for terminating or otherwise diminishing employment.'" *Graham v. Graham*, 2020-Ohio-1435, ¶ 9 (3d Dist.), quoting *Aldo v. Angle*, 2010-Ohio-2008, ¶ 35 (2d Dist.); *Page v. Page*, 2022-Ohio-411, ¶ 41 (2d Dist.) ("A parent seeking to avoid imputation of income must show an objectively reasonable basis for terminating or otherwise diminishing employment."). Reasonableness is measured by examining "the effect of the parent's decision on the interests of the child" and determining whether the employment decision serves "the long-term, best interest of the children." *Harper v. Harper*, 2002 WL 1938319, *3 (10th Dist. Aug. 22, 2002); *see also Graham* at ¶ 9 ("'Reasonableness is measured by examining the effect of the parent's decision on the interest of the child.'"), quoting *Aldo* at ¶ 35; *Page* at ¶ 41 ("Reasonableness is measured by examining the effect of the parent's decision on the interests of the child."). *Koogler v. Koogler*, 1997 WL 435691 (2d Dist. July 18, 1997).

{¶ 57} The reasonableness inquiry focuses on objective circumstances rather than

subjective motivations. The governing test examines "'not only whether the change was voluntary, but also whether it was made with due regard to the obligor's income-producing abilities and her or his duty to provide for the continuing needs of the child or children concerned.'" *Ketchum v. Coleman*, 2014-Ohio-858, ¶ 11 (2d Dist.), quoting *Woloch v. Foster*, 98 Ohio App.3d 806, 811 (2d Dist. 1994); *accord G.P. v. L.P.*, 2022-Ohio-1373, ¶ 78 (5th Dist.); *Cummin v. Cummin*, 2015-Ohio-5482, ¶ 20 (4th Dist.); *Reese v. Reese*, 2019-Ohio-2810, ¶ 18 (1st Dist.).

{¶ 58} This standard strikes a balance. On one hand, parents with a duty to support a child "'are as free as those who are not to adjust their employment to conform to their opportunities, and to their disadvantages as well.'" *Id.* at ¶ 13, quoting *Palmer v. Palmer*, 1995 WL 396509, *3 (2d Dist. Jun. 14, 1995); *Koogler v. Koogler*, 1997 WL 435691, *10 (2d Dist. July 18, 1997). On the other hand, "'they may not use their separation or divorce to avoid their responsibilities, and their children should not suffer from needs that would have been met by their parents had their marriage not ended or separation not ensued.'" *Id.*, quoting *Palmer* at *3. The critical question, therefore, is whether the parent's decision demonstrates due regard for the continuing needs of the child. *Id*. at ¶ 11.

{¶ 59} Not every voluntary departure from employment constitutes voluntary unemployment for child-support purposes. Ohio law permits reasonable employment changes that serve children's long-term interests, even when those decisions result in short-term income reduction. Courts will find voluntary unemployment, however, when parents make employment decisions primarily for personal convenience without regard to their support obligations.

### 3. Mother's Arguments

{¶ 60} Mother advances substantial arguments that her employment decision was objectively reasonable. She emphasizes that when she quit her employment in October

2023, no child-support obligation existed. The parties maintained a shared-parenting plan with a zero-dollar support order. She made her employment decision before Father initiated modification proceedings and before any support obligation arose. Mother contends she cannot be faulted for avoiding an obligation that did not yet exist.

{¶ 61} Mother further argues that her changed family circumstances justified her employment decision. As a single mother following the divorce, she needed employment income to support herself and the child. Upon remarrying in August 2023, her husband's income from self-employment and veterans' disability benefits provided adequate support for the family, including the child. Mother contends that families may organize themselves with one spouse working and the other providing direct parental care, and that Ohio law should not penalize her for choosing this traditional arrangement.

{¶ 62} Mother also points out that living 90 minutes from her workplace, she faced a three-hour daily commute. She argues that maintaining such a commute while managing parenting responsibilities for multiple children was objectively unreasonable. Although she attempted to maintain the job for two months post-relocation, she ultimately concluded the arrangement was unsustainable.[2]

{¶ 63} Finally, Mother notes that she is homeschooling her other children and managing the household and farm. She contends that providing direct parental care and home education serves her children's interests and that the trial court improperly discounted the value of this contribution.

---

2. The trial court found that "she could have worked from home," but in her brief, Mother says that her employer eliminated the remote-work arrangement that had made continued employment feasible. Father's brief agrees with Mother, acknowledging "[t]here was not an opportunity within KW Flooring for her to work remote." Mother, though, did not present evidence on this matter during the trial. She attempted to introduce evidence after the trial from her former employer confirming that remote work was unavailable. The trial court acknowledged this evidence in its decision but declined to consider it, stating: "Ms. Boyle submitted a letter from her previous employer with her objection, but as it was not introduced at trial, the undersigned will not consider the same." Although this exclusion of relevant evidence undermines the factual foundation for the court's voluntary-unemployment determination, because it was not properly presented, we cannot consider it.

{¶ 64} These arguments have force. Courts have recognized that enhanced parental involvement benefits children and that parents may make reasonable employment changes that prioritize direct caregiving over external employment. In *Graham*, 2020-Ohio-1431, at ¶ 9, the court emphasized that "there are times when a court must respect the reasonable choice of an obligor to attempt to better his life in the hope that such a choice will ultimately benefit the lives of the children." Similarly, in *Shank v. Shank*, 122 Ohio App.3d 189 (3d Dist. 1997), the court approved a mother's decision to accept a $15,000 salary reduction to relocate closer to her children and participate in their after-school activities, recognizing that enhanced involvement in children's lives may justify reduced earning capacity.

{¶ 65} We acknowledge the legitimacy of Mother's position that remarriage fundamentally altered her circumstances. A parent's decision to rely on spousal income while providing direct care for children is not inherently unreasonable. Many families organize themselves precisely this way, and Ohio law does not require both parents in intact families to maintain external employment. The question is whether such arrangements remain reasonable when one parent has a child-support obligation from a prior relationship.

### 4. Evidence Supporting the Trial Court's Determination

{¶ 66} Despite these considerations, substantial evidence supports the trial court's finding of voluntary unemployment. Several factors distinguish this case from situations where courts have approved employment changes that benefit children.

{¶ 67} First, Mother made no effort whatsoever to maintain any earning capacity or seek alternative employment. The record contains no evidence that Mother sought any position in Indiana, explored remote work opportunities with other employers, investigated part-time employment, or took any steps to preserve her ability to contribute financially to

the child's support. Even after Father filed for modification and support obligations became an issue, Mother presented no evidence of job search efforts or attempts to secure employment.

{¶ 68} This complete abandonment of employment efforts distinguishes Mother's situation from cases where courts have approved income reductions. In *Shank*, the mother who accepted lower pay to be closer to her children maintained substantial employment and earning capacity. She did not eliminate her ability to contribute to support; she reduced her income to serve her children's interests. Similarly, in *Graham*, the father who quit his second job remained fully employed in his primary position earning nearly $250,000 annually. He gave up supplemental income but maintained his principal source of earnings. Here, by contrast, Mother eliminated her earning capacity entirely and made no effort to preserve any ability to contribute financially.

{¶ 69} Second, Mother's stated reasons for leaving employment center on lifestyle preferences rather than the child's needs. Mother testified that she decided to relocate to Aurora, Indiana, because she and her husband "discussed what they should do and they decided he should keep his property." She explained that "[h]er passion and desire to have a garden and become more self-sufficient can be realized with Kevin's property." The GAL's report documents Mother's testimony that her family "would like to be self-sustaining within one year growing their own food and harvesting their own meat so they don't have to rely on the grocery store." They want to "grow their own wheat to mill it" and "reduce grocery trips to one time per month." They "installed a generator on their property so if the power goes out, they still have electric and running water."

{¶ 70} Father's testimony characterized this as Mother attempting to live "off grid" and "withdrawing from normal everyday society" in what represented "an abrupt right turn from her prior life." While Mother's decision to pursue a more self-sufficient lifestyle on

rural property is certainly her prerogative, this appears to be a choice motivated by her and her husband's personal preferences, which excluded consideration of the particular needs of this child. The child attends school in Ohio, lives primarily with Father under the modified arrangement, and has her established life in Ohio. Mother's decision to pursue homesteading and self-sufficient living does not enhance her relationship with this child in the way that the mother's relocation decision in *Shank* enhanced her involvement with her children's daily activities.

{¶ 71} Third, the timing of Mother's employment decision raises questions about its necessity. Mother testified that she initially planned to keep her job in Ohio and would go into the office during the weeks she had the child, transporting the child to and from school during her commute. She maintained this arrangement for approximately two months after relocating to Indiana. She quit her employment in October 2023, about two months after her August 2023 marriage.

{¶ 72} This timing suggests that continued employment was not immediately impossible due to the commute or relocation. Mother successfully maintained her position for two months while managing the commute. The fact that she ultimately decided this arrangement was not sustainable does not establish that employment was objectively impossible. Rather, it suggests that Mother decided the effort required to maintain employment was not worthwhile given her desire to pursue the self-sufficient lifestyle she and her husband preferred. If the employer's elimination of remote work truly made continued employment impossible, Mother likely would not have attempted to maintain the position for two months post-relocation.

{¶ 73} Fourth, Mother's decision resulted in the loss of health-insurance coverage for the child. Mother admitted during cross-examination that "when she quit her job Child lost insurance." This demonstrates a lack of consideration for the child's continuing needs.

While Father provides health insurance through his employment, Mother's decision to quit eliminated a source of coverage for the child without ensuring alternative arrangements were in place.

**5. Application of the Objectively-Reasonable-Basis Standard**

{¶ 74} Applying the objectively-reasonable-basis standard to these facts, the trial court could reasonably conclude that Mother's employment decision lacked due regard for her duty to provide for the child's continuing needs. While Mother argues that her husband's income provides adequate support, this overlooks that child-support obligations arise from the parent-child relationship, not from the adequacy of alternative sources of support. A parent's remarriage and the availability of spousal income do not eliminate the parent's independent obligation to contribute to the child's support according to the parent's ability.

{¶ 75} The critical question is whether Mother demonstrated due regard for her income-producing abilities and her duty to provide for the child. The answer is no. Mother made no effort to maintain any earning capacity. She pursued lifestyle preferences that eliminated her ability to contribute financially. She became entirely dependent on a new spouse rather than preserving her ability to support her children independently. She provided no evidence that she considered her support obligations when making her employment decision. These factors support a finding that her unemployment was voluntary in the legal sense, meaning it lacked an objectively reasonable basis focused on the child's interests.

{¶ 76} Mother's situation differs materially from cases where courts have approved employment changes. This is not a case like *Shank*, where a parent accepted reduced income specifically to enhance involvement in her children's daily lives. Mother's child lives primarily in Ohio with Father; the homesteading lifestyle does not enhance Mother's

relationship with this particular child. This is not a case like *Graham*, where a parent quit a second job while maintaining substantial primary employment. Mother eliminated her earning capacity entirely. This is not a case where external circumstances beyond the parent's control caused unemployment. Mother chose to relocate to rural Indiana to pursue a particular lifestyle and then chose to quit her employment to focus on homesteading goals.

{¶ 77} The circumstances more closely resemble *Ketchum v. Coleman*, where a mother quit her employment shortly after the father filed support modification motions and enrolled in full-time college classes in an unrelated field. The court found she "provided no evidence that she gave any consideration to her current obligation to support her children" when she decided to leave her employment. *Ketchum*, 2014-Ohio-858, ¶ 18. The court concluded that "the evidence presented at the hearing supports a finding that [the mother] did not have an objectively reasonable basis for quitting her job" given her training and her failure to consider her support obligations. *Id.*

{¶ 78} Similarly here, Mother provided no evidence that she considered her obligation to support the child when she quit her employment. Her testimony focused entirely on her desire to pursue self-sufficient living with her new husband. Like the *Ketchum* mother who pursued education in an unrelated field, Mother pursued a lifestyle that eliminated rather than maintained her earning capacity. The trial court could reasonably conclude that this decision lacked an objectively reasonable basis focused on the child's interests.

### 6. Burden of Proof and Mother's Own Testimony

{¶ 79} Mother argues that Father, as the party seeking imputation, failed to carry his burden of proof. She contends that Father presented no vocational expert testimony, no labor market analysis, and no evidence regarding employment opportunities in Aurora,

Indiana. While Mother correctly identifies Father's burden, the argument overlooks a critical aspect of the record: Mother's own testimony established the facts supporting a finding of voluntary unemployment.

{¶ 80} As the Second District explained in *Ketchum*, "while the burden of proof lies on the party seeking to impute income . . . it was not necessary for him to testify regarding the requirements . . . since [the mother's] testimony in this regard was clearly sufficient to establish that she was voluntarily unemployed." *Ketchum*, 2014-Ohio-858, ¶ 17. When the obligor parent's own testimony establishes the relevant facts, including the voluntary nature of the unemployment and the reasons for the employment decision, the moving party need not present additional evidence.

{¶ 81} Here, Mother testified to all the critical facts: her prior earnings of $70,000 to $80,000 annually, her four years of employment with KW Flooring, her decision to relocate to Indiana to pursue a self-sufficient lifestyle on her husband's rural property, her choice to quit her employment, her desire to focus on homesteading and becoming self-sustaining, her complete financial dependence on her husband's income, and her lack of any employment after leaving KW Flooring. This testimony provided sufficient evidence for the trial court to find voluntary unemployment.

{¶ 82} Mother contrasts her situation with *McLaughlin v. Kessler*, 2012-Ohio-3317 (12th Dist.), where we found insufficient evidence of voluntary unemployment. In *McLaughlin*, the mother was an unskilled worker whose temporary position ended, and she actively sought employment at multiple retail establishments after her position ended. The father presented no evidence regarding the mother's earning capacity or available positions. Here, by contrast, Mother was a skilled sales professional with a demonstrated earning capacity of $70,000 to $80,000 annually. She did not lose her position; she voluntarily quit. She presented no evidence of any job search efforts or attempts to

maintain earning capacity. Her own testimony established both her ability to earn substantial income and her choice to eliminate that income in favor of lifestyle preferences.

## 7. Consideration of Statutory Factors

{¶ 83} Mother also contends that the trial court failed to adequately consider the 11 statutory factors enumerated in R.C. 3119.01(C)(18)(a). These factors include the parent's prior employment experience, education, physical and mental disabilities, availability of employment in the geographic area, prevailing wage and salary levels, special skills and training, evidence that the parent has the ability to earn the imputed income, the child's age and special needs, the parent's increased or decreased earning capacity, and any other relevant factor.

{¶ 84} The trial court's analysis of these factors was admittedly brief. The court noted Mother's work history, her prior income level of $70,000 to $80,000, and her four years of employment with KW Flooring. The court found that Mother "is capable of making the (lesser) amount of income she historically made." We note that "while consideration of relevant factors outlined in the statute is mandatory, the trial court is required neither to hear evidence on each factor nor discuss each factor in its analysis." (Citations omitted.) *Justice*, 2007-Ohio-5186, at ¶ 13. While the court did not extensively analyze each statutory factor, the record provides support for the essential findings.

{¶ 85} Mother had four years of employment experience earning $70,000 to $80,000 annually in sales, demonstrating both her prior employment experience and her ability to earn the imputed income. The record contains no evidence of physical or mental disabilities affecting her earning capacity. Mother has sales experience and skills gained through years of employment. The child is nine years old with no special needs identified that would affect Mother's earning capacity.

- 26 -

{¶ 86} Mother argues that the court failed to consider employment availability and prevailing wage levels in Aurora, Indiana. But Mother herself presented no evidence regarding the Aurora labor market. As the obligor claiming that her unemployment was not voluntary or that she cannot earn the imputed amount in her new location, Mother bore some responsibility to present evidence supporting her position. She offered no testimony about job search efforts, positions she applied for, prevailing wages in Aurora, or obstacles to employment in her area. In the absence of such evidence, the trial court could reasonably rely on Mother's demonstrated earning capacity in her prior position.

{¶ 87} Moreover, Mother's own testimony suggests that geographic limitations on employment opportunities stemmed from her choice to relocate to a rural area specifically to pursue self-sufficient living. To the extent that rural Aurora, Indiana, offers fewer employment opportunities than the Dayton metropolitan area, this limitation flows from Mother's voluntary decision to relocate to pursue lifestyle preferences. Ohio courts have recognized that parents may choose where to live, but they remain responsible for supporting their children regardless of how their location decisions affect earning capacity. *See Boltz v. Boltz*, 31 Ohio App.3d 214 (3d Dist. 1986) (parent's choice to relocate for new spouse does not justify reduced support).

{¶ 88} We acknowledge that the trial court's statutory factor analysis could have been more thorough. A more detailed examination of employment availability and wage levels in Mother's new location would have strengthened the decision. But the absence of extensive factor-by-factor analysis does not constitute an abuse of discretion when the record provides adequate support for the imputation. Mother's demonstrated earning capacity over four years, combined with her own testimony about her employment decision and her failure to present evidence of job search efforts or labor market limitations, provides sufficient basis for the imputation.

## 8. Amount of Income Imputed

{¶ 89} The trial court imputed $70,000 annually to Mother, the low end of her testified earning range and her actual salary for four years at KW Flooring. This amount is supported by competent, credible evidence. Mother's own testimony established that she earned $70,000 to $80,000 annually in sales despite lacking a college degree. She maintained this employment for four years, demonstrating sustained earning capacity at this level. The court reasonably concluded that Mother retains the ability to earn this amount.

{¶ 90} Mother argues that the court failed to account for differences between the Dayton area labor market and rural Aurora, Indiana. While geographic wage differentials are a relevant consideration, Mother presented no evidence quantifying any such difference or demonstrating that comparable positions are unavailable in her area. In the absence of evidence to the contrary, the trial court reasonably relied on Mother's demonstrated earning capacity.

{¶ 91} The amount imputed is conservative. The court selected the lower end of Mother's testified range rather than imputing $80,000. The court did not increase the imputation based on Mother's increased earning capacity through experience, R.C. 3119.01(C)(18)(a)(ix), though such an increase might have been justified given her four years of sales experience since the divorce. Under these circumstances, the amount imputed does not constitute an abuse of discretion.

## 9. Deference to Trial Court Findings

{¶ 92} The abuse of discretion standard requires substantial deference to trial court determinations in child support matters. As we have recognized, "the power of the trial court to exercise discretion is peculiarly important in proceedings involving the custody and welfare of children." *Grover v. Dourson*, 2019-Ohio-2495, ¶ 15 (12th Dist.).

The trial court and magistrate heard the testimony, observed the witnesses, and made credibility assessments. They were positioned to evaluate Mother's explanation for her employment decision and to determine whether she demonstrated due regard for her support obligations.

{¶ 93} This case presents genuinely difficult questions. Reasonable judges could reach different conclusions about whether Mother's decision to rely on her husband's income while providing direct care for her household represents a reasonable family choice or an abdication of her independent support obligation. We acknowledge the force of Mother's arguments that her changed circumstances justified her employment decision. Had we been deciding this question in the first instance, we might have found the evidence in equipoise or even weighing slightly in Mother's favor.

{¶ 94} But our role is not to decide the question de novo. Under the abuse-of-discretion standard, we ask only whether the trial court's decision is unreasonable, arbitrary, or unconscionable. Given Mother's testimony about pursuing an off-grid lifestyle and becoming self-sufficient, her complete lack of any job search efforts, her elimination of all earning capacity rather than merely reducing her income, her admission that the child lost health insurance when she quit, and the timing and circumstances of her employment decision, we cannot say that the trial court's finding of voluntary unemployment was unreasonable. Substantial evidence supports the conclusion that Mother's employment decision lacked an objectively reasonable basis focused on the child's interests.

{¶ 95} The trial court could reasonably conclude that Mother made a choice between maintaining earning capacity to support her child and pursuing lifestyle preferences with her new husband, and that she chose the latter. While Mother frames her decision as one of family organization, with her husband working and her providing

home care, the record suggests something more: a deliberate choice to pursue a self-sufficient, off-grid lifestyle that required eliminating employment entirely. The trial court could reasonably distinguish this from the ordinary situation of a remarried parent who relies on spousal income while caring for children.

### 10. Conclusion

{¶ 96} We conclude that the trial court did not abuse its discretion. The court made an express finding of voluntary unemployment. Mother's own testimony established the facts supporting this finding, satisfying Father's burden of proof. While Mother's decision to rely on her husband's income might be reasonable in some circumstances, the combination of factors here supports the trial court's conclusion that her decision lacked an objectively reasonable basis focused on the child's interests: her pursuit of lifestyle preferences rather than the child's needs, her complete elimination of earning capacity without any job search efforts, and the loss of insurance coverage for the child.

{¶ 97} Substantial evidence supports the finding of voluntary unemployment and the amount of income imputed. The trial court's determination rests on a sound reasoning process, even if another court might have reached a different conclusion on these facts.

{¶ 98} The second assignment of error is overruled.

### C. Guardian ad Litem Compliance with Sup.R. 48.03

{¶ 99} The third assignment of error alleges:

> The trial court erred by relying upon a Guardian ad Litem report prepared in violation of Sup.R. 48, thereby denying Appellant a fundamentally fair proceeding.

{¶ 100} In her third assignment of error, Mother contends that the trial court erred by relying on the GAL's report prepared, Mother says, in violation of Sup.R. 48.03. Mother argues that the GAL failed to observe the child with her in her home as required by Sup.R. 48.03(D)(2) and (D)(4), failed to adequately investigate Mother's household dynamics,

and improperly disclosed protected medical information. Mother requests that we strike the GAL's report from the record, remove the GAL from the case, and remand for a new trial. We decline to do any of these things.

### 1. The Nature and Effect of Superintendence Rule 48

{¶ 101} Sup.R. 48.03(D) sets forth duties of a guardian ad litem in custody proceedings. Mother invokes two specific provisions. Sup.R. 48.03(D)(2) requires that a GAL "observe the child with each parent, foster parent, guardian or physical custodian." Sup.R. 48.03(D)(4) requires that a GAL "visit the child at the residence or proposed residence of the child in accordance with any standards established by the court."

{¶ 102} The legal effect of these requirements is settled. The Ohio Supreme Court has held that Superintendence Rules "are administrative directives only and are not intended to function as rules of practice and procedure." *In re Detention of Williams*, 2011-Ohio-803, ¶ 12. They are "purely internal housekeeping rules which are of concern to the judges of the several courts but create no rights in individual defendants." *State v. Dillon*, 74 Ohio St.3d 166, 167 (1995). Applying these principles, "[c]ourts have generally held that a guardian ad litem's failure to comply with Sup.R. 48 is not grounds for reversal of a custody determination." (Citations omitted.) *In re A.M.*, 2023-Ohio-1523, ¶ 15 (12th Dist.).

{¶ 103} Mother invites us to depart from this settled precedent and treat Sup.R. 48 violations as grounds for reversal. We decline that invitation. The consistent interpretation across Ohio's appellate districts establishes that while Sup.R. 48 provides valuable guidance to guardians ad litem, it does not create mandatory procedural requirements whose violation compels reversal of an otherwise sound custody determination. A GAL must "perform whatever functions are necessary to protect the best interest of the child," R.C. 2151.281(H), but the specific manner in which a GAL conducts an investigation is a matter committed to professional judgment, not rigid adherence to administrative

directives.

## 2. The GAL's Investigation

{¶ 104} We nonetheless examine the specific allegations Mother raises about the GAL's investigation because even administrative guidelines serve important purposes, and substantial deviation from recommended practices could, in an appropriate case, contribute to a finding that the trial court abused its discretion in relying on a GAL's report. We must determine whether the investigation in this case was so deficient that the trial court acted unreasonably in crediting the GAL's recommendation.

{¶ 105} The record establishes the following undisputed facts about the GAL's investigation. On November 21, 2023, Attorney Michelle Maciorowski was appointed as the GAL. This was her second appointment in this case, as she had previously served as GAL for the parties before their June 29, 2021 agreed entry. On December 13, 2023, the GAL filed a "Notice of Intent to Visit Mother's Home Through Video." No written objection to this notice appears in the docket. On February 19, 2024, the GAL issued her report recommending that shared parenting be terminated and that Father be granted legal custody. A trial was held on April 4, 2024, at which both parents and the GAL testified.

{¶ 106} Mother identifies three specific deficiencies in the GAL's investigation. First, the GAL did not physically observe the child in Mother's home with Mother and the child's stepsiblings and stepfather. Second, the GAL visited Father's home twice but never visited Mother's home in person. Third, the GAL disclosed protected medical information about a third party without consent. We address each contention in turn.

## 3. Observation of Child in Mother's Home

{¶ 107} The magistrate's decision reflects that during cross-examination, "GAL Maciorowski acknowledged that she did not observe Child in mother's home." This acknowledgment is significant because Sup.R. 48.03(D)(2) directs a GAL to "observe the

child with each parent." The GAL did observe the child with Father during her two visits to Father's home. She did not observe the child with Mother in Mother's home.

{¶ 108} The GAL filed a "Notice of Intent to Visit Mother's Home Through Video" and testified that she "filed a motion to review home by video conferencing means and spoke to Child about her relationship with [Mother's husband and his three children]." The magistrate found that the GAL has "no doubt" that the child has a loving relationship with everyone in mother's home. But speaking to the child about these relationships is analytically distinct from observing the child interacting with family members. The plain language of Sup.R. 48.03(D)(2) contemplates observation, not just inquiry.

{¶ 109} Mother contends that when the GAL filed notice of a video home visit, Mother reasonably expected the GAL would conduct a video observation of the child in the home with family members present. The record suggests that this video observation did not occur. Instead, the GAL conducted what appears to have been an in-camera interview with the child about her relationships. Whether this was what the GAL intended by her notice or whether circumstances prevented the planned video observation, the result was that the GAL did not observe the child with Mother as Sup.R. 48.03(D)(2) recommends.

{¶ 110} This represents a departure from the guideline set forth in the Superintendence Rule. But the GAL obtained information about the child's home life and relationships through other means. She interviewed both Mother and Father extensively. She spoke with the child about the child's relationships with her stepfather and stepsiblings. She heard testimony at the hearing from both parents about conditions in Mother's home, including the sleeping arrangements, the lifestyle choices regarding self-sufficiency, the disciplinary practices, and the family dynamics. The GAL testified that based on all the information she gathered, she had no doubt that the child has loving

relationships with everyone in Mother's home. The GAL's concerns were not about whether the child was loved, but about other factors affecting the child's best interest, including parental communication, stability, and the child's educational and social needs.

{¶ 111} We note too that Sup.R. 48.03(D)(4) requires the GAL to "visit the child at the residence or proposed residence of the child *in accordance with any standards established by the court*." (Emphasis added.) The rule specifically contemplates that home visits should be conducted "in accordance with any standards established by the court." The GAL provided proper notice through her "Notice of Intent to Visit Mother's Home Through Video." The trial court's failure to object to this arrangement or direct an alternative approach constitutes implicit approval of the proposed method.

### 4. Asymmetry in Home Visits

{¶ 112} Mother correctly notes that the GAL visited Father's home twice but never physically visited Mother's home. This asymmetry is apparent on the record. The question is whether this asymmetry rendered the GAL's investigation inadequate such that the trial court abused its discretion in relying on her recommendation.

{¶ 113} Several factors in the record explain, though do not necessarily justify, this disparity. First, the GAL's investigation took place after Mother had moved to Aurora, Indiana, approximately an hour and a half from Father's residence in West Alexandria, Ohio. The distance may have affected the practical feasibility of in-person visits. Second, Mother had moved nine times since the parties' separation and eight times since January 2019. The pattern of frequent relocation was itself a matter the GAL needed to assess in evaluating stability. Third, at the time of the GAL's investigation, the child was spending equal time with both parents under the existing shared parenting plan, but the child attended school in Valley View, and Mother's Indiana residence created logistical challenges for school attendance. The GAL reasonably focused on understanding both

the child's current living situation and the comparative stability of the two households.

{¶ 114} These explanations do not eliminate the fact that the GAL's investigation methods differed with respect to the two parents. A GAL ideally should observe a child with both parents in both homes to form a complete picture. The GAL did not do so here. But the question is not whether the investigation was ideal, but whether the trial court abused its discretion in finding the investigation adequate. The GAL gathered information through interviews, reviewed court filings, testified at the hearing, and was subject to cross-examination by Mother. The trial court had the benefit of hearing directly from both parents at the trial, observing their demeanor, and assessing their credibility. In these circumstances, the asymmetry in home visits, while not optimal, does not render the trial court's reliance on the GAL's recommendation an abuse of discretion.

### 5. Disclosure of Medical Information

{¶ 115} Mother contends that the GAL improperly disclosed protected medical information of a third party without consent. The trial court addressed this argument in its April 10, 2025 entry, noting that "the Order (re) appointing the Guardian Ad Litem gave her authority to secure and share the health information she received" and that such information "was relevant to her investigation." The trial court further observed that "the undersigned is not certain that this is [Mother]'s issue to raise."

{¶ 116} The trial court's analysis is sound. When a GAL is appointed in a custody case, the appointing order typically authorizes the GAL to obtain relevant information necessary to fulfill her duties, including medical and educational records. The GAL's duty is to investigate all relevant matters bearing on the child's best interest. If the GAL obtained health information under her appointment and used that information in her investigation, she acted within the scope of her authority.

{¶ 117} Moreover, Mother has not demonstrated standing to assert a HIPAA

violation on behalf of a third party who is not a party to this litigation. Even if such a violation occurred, Mother has not shown how it materially affected the custody determination or prejudiced her rights. *See In re K.H.*, 2019-Ohio-3668, ¶ 42 (12th Dist.) (finding no reversible error from GAL's alleged procedural violations where appellant failed to demonstrate prejudice). The trial court's reliance on the GAL's report must be evaluated based on whether the report provided reliable information relevant to the child's best interest, not on whether every aspect of the GAL's information-gathering complied with privacy regulations applicable to third parties.

### 6. Conclusion

{¶ 118} The GAL's investigation could have been more thorough in some respects. Observation of the child with Mother in Mother's home would have provided additional information. Symmetrical home visits to both parents would have been preferable. But the question is not whether the investigation was perfect, but whether the trial court abused its discretion in finding it adequate in light of all the evidence before it.

{¶ 119} The GAL in this case conducted an investigation that, while not adhering to every recommended practice in Sup.R. 48.03, provided substantial information relevant to the child's best interest. More importantly, the trial court's custody determination rested on the totality of the evidence presented at the hearing, including extensive testimony from both parents and the GAL. The trial court independently reviewed the record and Mother's objections before adopting the magistrate's decision. That decision was supported by competent, credible evidence, and the trial court did not abuse its discretion.

{¶ 120} The third assignment of error is overruled.

### III. Conclusion

{¶ 121} We have overruled each of the assignments of error presented. The trial court's judgment is affirmed.

PIPER, P.J., and SIEBERT, J., concur.

## J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Preble County Court of Common Pleas, Domestic Relations Division, for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

/s/ Robin N. Piper, Presiding Judge

/s/ Mike Powell, Judge

/s/ Melena S. Siebert, Judge